# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| TURKISH COALITION OF AMERICA, INC.<br>1025 Connecticut Ave.<br>Suite 1000<br>Washington, D.C. 20036<br><br>and<br><br>Sinan Cingilli<br>7200 Annapolis Circle North<br>Maple Grove, MN 55311<br><br>                   Plaintiffs,<br><br>v.<br><br>ROBERT BRUININKS,<br>in his individual capacity.<br>176 N. Mississippi River Blvd.<br>St. Paul, MN 55104<br><br>BRUNO CHAOUAT,<br>in his individual capacity.<br>756 Social Sciences Tower<br>267 19th Ave. S.<br>Minneapolis, MN 55455<br><br>THE UNIVERSITY OF MINNESOTA,<br>360 McNamara Alumni Center<br>200 Oak Street S.E.<br>Minneapolis, MN 55455<br><br>                   Defendants. | Civil Action No. _____ |

## COMPLAINT

Plaintiffs, the Turkish Coalition of America, Inc. (hereinafter referred to as "TCA"), and Sinan Cingilli, hereby file this Complaint against Robert Bruininks, President of the University of Minnesota, in his individual capacity,  Bruno Chaouat, Director of the Center

For Holocaust and Genocide Studies at the University of Minnesota ("CHGS"), in his individual capacity, and the University of Minnesota, alleging as follows:

## SUBJECT MATTER JURISDICTION

1.      This Court is vested with subject matter jurisdiction over Plaintiffs' complaint under 28 U.S.C. 1331 and 1367.   Plaintiffs' federal claims arise under the United States Constitution and 42 U.S.C. § 1983. Plaintiffs' federal and state claims stem from the same nucleus of operative fact. *See United Mine Workers v. Gibbs*, 383 U.S. 715 (1966)("The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is power in federal courts to hear the whole.")

## PERSONAL JURISDICTION AND VENUE

2.      This Court enjoys personal jurisdiction over Defendants because they reside in Minnesota and the acts or omissions that gave rise to Plaintiffs' claims occurred in Minnesota.  Venue is proper in this Court under 28 U.S.C. § 1391(b).

## INTRODUCTION AND SUMMARY

3.      This Complaint challenges the counter-educational blacklisting by the University of Minnesota's Center for Holocaust and Genocide Studies ("CHGS") of a particular viewpoint communicated on Plaintiff TCA's website, which Plaintiff Cingilli desired to use in his educational pursuits to develop critical thinking without fearing adverse academic retaliation by Defendants.   TCA's website maintains that whether the tragic deaths of Ottoman Armenians in World War I constitute the crime of genocide under the Genocide Convention of 1948 and implementing domestic law in the United States is a genuine historic and legal

controversy. Plaintiff TCA's website further maintains that absent either a formal adjudication of the matter before an independent and impartial tribunal or the publication of findings by a historical commission established by the mutual agreement of Turkey and Armenia the Ottoman Armenian tragedy should not be prejudged as an instance of genocide. TCA's website argues that the facts and the law make it unlikely that a genocide charge could be sustained against the Ottoman government or its successor before a neutral arbiter (hereinafter "the contra-genocide viewpoint").

4.      From 2006 until November 18, 2010, when Defendants were presented with an unfiled complaint drafted by Plaintiffs, the "Curriculum Models" section of the CHGS' website warned students not to visit or use Plaintiff TCA's website in their educational endeavors. The warning impliedly threatened academic retaliation for disobedience. *See* http://www.chgs.umn.edu/educational/curriculum.html (last visited Nov. 15, 2010). Exhibit 1. On information and belief, between 2006 and November 18, 2010, University of Minnesota students and professors generally desisted from visiting or using Plaintiff TCA's website for fear of adverse consequences, including loss of academic standing, at the hands of Defendants. CHGS' motivation for blacklisting Plaintiff TCA's website was hostility towards the contra-genocide viewpoint despite its educational credibility. Plaintiff TCA was also defamed and stigmatized by Defendants assertion that its website was "unreliable" and indistinguishable from those of Holocaust deniers whose work finds no support in American academia. By contrast, numerous respected scholars in the U.S. and abroad support the contra-genocide viewpoint on the Ottoman Armenian controversy; among them are Arend Jan Boekestjin of Utrecht University, Netherlands, Youssef Courbage of the National Institute of Demographic Studies, Paris, France, Paul Dumont, of Marc Bloch University,

Strasbourg, France, Bertil Dunér of the Swedish Institute of International Affairs, Stockholm, Sweden, Gwynne Dyer, Military Historian and Journalist, Philippe Fargues of the National Institute of Demographic Studies, Paris, France, Micheal M. Gunter of Tennessee Technical University, Eberhard Jäckel of Stuttgart University, Yitzchak Kerem of Hebrew University of Jerusalem, Bernard Lewis of Princeton University, Guenther Lewy of the University of Massachusetts, Heath W. Lowry of Princeton University, Andrew Mango, of the University of London, Michael E. Meeker of the University of Washington, Justin McCarthy of the University of Louisville, Hikmet Ozdemir, of the Turkish History Society in Ankara, Turkey, Stephen Pope, former Oxford modern-history scholar, Michael Radu of the Foreign Policy Research Institute, Jeremy Salt of Melbourne University, Stanford J. Shaw of UCLA, Norman Stone of Bilkent University, Hew Strachan of Oxford University, Elizabeth-Anne Wheal of Cambridge University, Brian G. Williams of the University of Massachusetts at Dartmouth, Gilles Veinstein of the Collège de France, Malcom E. Yapp of the University of London, and Robert Zeidner of the University of Utah.

5.      Defendants' blacklisting of TCA's website served no educational purpose. Mark B. Rotenberg, general counsel of the Defendant University, confirmed to the University of Minnesota Daily that the blacklisting ended "for academic reasons." Laura Sievert, *Lawsuit Brewing Over U Website Warnings,* November 22, 2010. No university in the United States but the University of Minnesota featured such a blacklist. It contradicted the Defendant University of Minnesota's professed educational mission, and the Board of Regents policy on Academic Freedom and Responsibility.

6.      Defendants defamed Plaintiff TCA by including TCA's website on a blacklist with websites disputing the Holocaust, under the general heading of websites that engage in

"denial," a term customarily understood by the public as meaning denying the Holocaust of European Jewry during World War II. Exhibit 1, Exhibit 7. A signature tactic of opponents of the contra-genocide viewpoint is to equate any person or institution who quibbles in any way with the conclusion that the Ottoman Armenian experience constitutes the crime of genocide to a Holocaust denier.

7.      Defendants' method of blacklisting "Unreliable Websites" possessed fewer procedural safeguards against error or prejudice than the Vatican's notorious *Index Librorum Prohibitorum,* or List of Forbidden Books, which censored or forbade possession of tracts by, among others, Francis Bacon, John Milton, John Locke, David Hume, Blaise Pascal, Rene Descartes, Jean-Jacques Rousseau, and Victor Hugo, for heresy or moral deficiency. Plaintiff TCA was denied notice that its website was being considered for listing or an opportunity to respond, or, after listing, an opportunity to appeal. The person who decided to blacklist TCA's website remains anonymous and, on information and belief, was acutely biased against the contra-genocide viewpoint. Defendants created no formal procedures for Plaintiff TCA to protest. Plaintiff TCA, nevertheless, sought its removal from Defendants' blacklist through letters of remonstrance dispatched by the Turkish American Legal Defense Fund ("TALDF") on TCA's behalf. Exhibit 2, Exhibit 3. The protest letters were summarily rebuffed for more than one year until November 18, 2010. Exhibit 4, Exhibit 5.

8.      Defendants' standards for blacklisting a website as unreliable and for labeling a website a source of illegitimate information were entirely subjective and easily manipulated to target disfavored viewpoints. Exhibit 1, Exhibit 7. They were unconstitutionally vague by failing to give fair warning as to what deficiencies in reliability could occasion a blacklisting. CHGS' website warning read as follows:

**Unreliable Websites**

We do not recommend these sites.  Warnings should be given to students writing papers that they should not use these sites because of [1] **denial,** [2] **support by an unknown organization, or** [3] **contents that are a strange mixture of fact and opinion.**  We also do not advise using sites with excessive advertising.

http://www.chgs.umn.edu/educational/curriculum.html (last visited Nov. 15, 2010)

(emphasis added).  Exhibit 1.

9.      The term "denial" is hopelessly ambiguous.   It could refer to denying the geocentric theory of the universe.  Even when read in context as referring to genocide alone, the term is equivocal.  Does it reach denial of an alleged genocide irrespective of the evidence of guilt?  Bosnia & Herzegovina charged Serbia & Montenegro with the crime of genocide in connection with the killings of Bosnian civilians during the last Balkan War.  But the International Court of Justice in 2006, while affirming that the Srebrenica massacre was properly characterized as genocide, ruled that Belgrade's actions as a whole were not genocide.   This ruling caused great outrage among Bosnians worldwide, prompting shouts of genocide denial.  *See, e.g.,* Martin Shaw, *The International Court of Justice: Serbia, Bosnia, and genocide,* February 28, 2007 (http://www.opendemocracy.net/globalization-

institutions_government/icj_bosnia_serbia_4392.jsp).   Would the International Court of Justice's website now be ripe for inclusion on the "Unreliable Websites" list?

10.     Also, Azerbaijan has accused Armenia of genocide in connection with massacres of ethnic Azeris in the Nagorno-Karabakh region.   *See, e.g., www.khojaly.net, www.khojaly.org.*  Yet, aside from blacklisting a website that favors Azeri control of the

region, CHGS was silent on the issue. Defendants' refusal to accept the possibility that Armenians may have committed genocide against Azerbaijanis is tantamount to denial. If CHGS had applied its own blacklisting standards evenhandedly, its own website would have been blacklisted as engaged in "denial."

11.     The "strange mixture of fact and opinion" category was equally vague and invited manipulation to disparage disliked viewpoints. Many would describe major newspapers such as *The New York Times* or *The Wall Street Journal* as earmarked by a "strange mixture of fact and opinion." In the world of education, the phrase has no delimiting construction. To borrow from Humpty Dumpty as portrayed in Lewis Carroll's Through the Looking Glass, the phrase meant whatever Defendants wanted it to mean, neither more nor less.

12.     Defendants' blacklist transparently aimed to discourage student or professor visits and use of TCA's website and exposure to the contra-genocide viewpoint. Defendant Chaouat strongly and repeatedly discouraged Plaintiff Cingilli from using the blacklisted websites, which the Defendant had marked with a "scarlet letter." Defendant Chaouat also steered Plaintiff Cingilli towards sources he recommended as reliable. Mark B. Rotenberg, the University's general counsel, related to the University of Minnesota Daily, "Those sites were considered unreliable for students and shouldn't be used by students when they are writing their papers and such." The only historical episodes addressed on the blacklisted websites are the Ottoman Armenian tragedy and the Holocaust. No other alleged genocide, whether affirmed or disputed on a listed website, made an appearance on Defendants' blacklist—even recently adjudicated historical events like the conflict in Rwanda or the massacres in Srebrenica. Exhibit 1.

13.     This Complaint does not question academic freedom and the broad discretion enjoyed by state universities to select bona fide pedagogical tools for instructing students or guiding professors.  Education should be left to educators, not federal judges.  But the blacklisting of Plaintiff's website served no educational purpose and lacked any educational motivation.  The standards for listing were not educational suitability.  To the contrary, the purpose and effect of the website blacklisting by Defendants was to obstruct education and the development of critical thinking by placing an undue burden on students to access and use educationally suitable websites.

14.     Defendants' blacklisting of Plaintiff TCA's website violated clearly established constitutional rights under the due process and equal protection clauses of the Fourteenth Amendment and freedom of speech protected by the First Amendment that would have been known to a reasonable person.  The blacklisting defamed Plaintiff TCA, in violation of Minnesota tort law, by likening it to Holocaust deniers and assailing its intellectual integrity.   The Defendants' defamatory blacklisting of Plaintiff TCA was not a discretionary function.  Defendants' blacklisting of websites and warning to students against their use or visitation violated the clearly established constitutional right of student Plaintiff Cingilli to access educationally suitable viewpoints without fear of academic reprisal which a reasonable person would have known.  Plaintiffs seek damages and attorney's fees under the Civil Rights Attorney's Fees Award Act of 1976.

15.     On November 18, 2010, at the eleventh hour after Plaintiffs had made known to Defendants their intent to file a First Amendment, due process, equal protection, and defamation complaint against them and provided them a copy of a draft complaint, Defendants dismantled their blacklist of unreliable websites.  Exhibit 5, Exhibit 6.

16.     On November 19, 2010, Brent P. Benrud, Associate General Counsel, University of Minnesota, wrote a letter to David Saltzman and Bruce Fein, attorneys for TALDF. Exhibit 5.  The letter stated that Defendant Chaouat had made an academic decision to remove the "unreliable websites" list from its website at least one month previously, well before the University received the draft complaint prepared by TALDF and: that "there are no plans to return the list to the website at any point in the future; that the decision to remove the unreliable website list "was based upon an academic judgment that the list no longer served a significant academic purpose"; and, that the decision "does not reflect a determination by the University that the inclusion of the list on the CHGS website violated any legal principle or University policy." Id.

17.     CHGS replaced its warning to students and professors against visiting its list of "unreliable websites" with a "Warning to Researchers" and students to beware of websites operated by Holocaust and genocide deniers that CHGS and other academics consider "unreliable."  Exhibit 6.  The "Warning to Researchers" also recommended three specific resources for "researchers interested in the history, psychology and ideology of Holocaust and genocide denial..."

18.     On or about November 24, 2010, Defendant Chaouat on the CHGS Internet website a "Response to 'Unreliable Websites'" that states, among other things, that his rationale for removing the links to "unreliable websites" was "never promote, even negatively, sources of illegitimate information;" that "I have never put a dubious source on a syllabus for my students, not even for the purpose of delegitimizing the source;" and, that the "decision to remove the links to "unreliable websites" was made before the

Turkish Coalition of America began its efforts to intimidate CHGS into removing the links." Exhibit 7.

## PARTIES

19.   Plaintiff, the Turkish Coalition of America ("TCA"), is a not-for-profit corporation organized under the laws of Massachusetts, with its main office located at 1025 Connecticut Ave. NW, Suite 1000, Washington, D.C., 20037.   On its website, TCA describes itself as follows:

> The Turkish Coalition of America (TCA) is an educational, charitable organization incorporated in February 2007. Based in the nation's capital, TCA's objective is to
>
> - Educate the general public about Turkey and Turkish Americans and voice their opinion on critical issues to interested parties.
> - Engage and cultivate a new generation of young Turkish American leaders;
> - Promote and advance the interests of the Turkish American community and Turks;
> - Foster friendship, understanding and cooperation between the United States and Turkey;
> - Protect the character and ensure a realistic portrayal of Turkey and Turkish Americans in the media and the arts;
> - Serve as a think tank of expertise and a clearinghouse of information on Turkey and Americans of Turkish descent;
> - Identify and recognize the achievements of Turkish Americans in academia, arts, business, education, government, public service and science.
>
> In carrying out its mission, TCA is committed to building coalitions and working with all like-minded organizations, based on shared values and goals, on the local, state and national levels in the sponsorship and organization of educational programs on Turkish American issues, Turkish heritage and Turkey.
>
> - Civic consciousness seminars on issues affecting Turkish Americans and the importance for Turkish Americans being involved in the political process.

- Scholarships and internship programs for Turkish Americans interested in political science, public administration and communication.
- News dissemination about the Turkish American perspective on critical issues and the activities and achievements of Turkish Americans.
- Educational and cultural tours between Turkey and the United States.
- Sister city relationships between Turkish and American cities.

20.    A side-project of TCA is the Turkish American Legal Defense Fund ("TALDF"), formed to prevent the silencing of Turkish American voices on political matters or otherwise by intimidation, harassment, or violence.  TCA also employs a team of experts to write and speak on US-Turkey relations for local, state, national and international audiences.  TCA spokespersons are frequently quoted in the mainstream U.S. media, for example, *The Washington Post,* and the Associated Press.  TCA is a respected voice on U.S.-Turkey relations in Congress, the Executive Branch, and major think tanks.

21.    TCA's website is not preoccupied with the historic dispute over whether the Ottoman Armenian tragedy constituted the crime of genocide.  TCA's website home page has 14 categories, which lead to 12 sub-categories, approximately 400 html pages and more than 100 pdf files. The site is updated regularly.   The 14 categories link to, for example, information concerning the TCA's scholarship program, the TCA's internship program, media articles in which the TCA appears or which address issues of concern to the TCA, events sponsored by or attended by the TCA, and a list of links to sites that the TCA finds noteworthy.

22.    Most relevant to the erstwhile CHGS blacklist is the "Issues & Information" sub-menu (http://www.turkishcoalition.org/issues.html). Within this are two subdirectories that address the historic controversy over the interpretation of Ottoman Armenian history. First is

the "Turkish History" subdirectory, which itself has seven tabbed destinations. In particular, the "Turkish Mortality and Migration" tab, which links to the "Baykan, Kuzay, and Kevenk Collection on Turkish Mortality and Migration" web library at the University of Louisville (http://louisville.edu/a-s/history/turks/). This collection catalogs books and maps on the, "forced migration and deaths of Turks and other peoples of the Ottoman Empire and nearby countries in the nineteenth and early twentieth centuries." The TCA reasonably believes that a reader of the catalogued material would learn that the traditional narrative voiced by many Armenian American groups and, apparently, the CHGS, on the fate of the Ottoman Armenians tends to ignore the ethnic cleansing of Ottoman Muslims and discount the Armenian Revolt. Their narrative lacks crucial historical context. Among the catalogued material are documents that describe atrocities committed against Ottoman Muslims by Armenian revolutionaries before and during World War I.

23.     A second link within the "Issues & Information" sub-menu is the "Armenian Issue" subdirectory, (http://www.turkishcoalition.org/issues_ar.html), which provides TCA's view on the historical controversy:

> The Armenian Diaspora claim of genocide is a one-sided assessment of the inter-communal war between Ottoman Armenians and Ottoman Muslims in 1915, and it prejudices Turkish and Armenian rapprochement.
>
> Over 1.1 million Ottoman Muslims perished as the Armenian Revolt (1885-1919) and inter-communal attacks aimed to carve out an ethnically and politically pure Armenian state from the eastern Ottoman Empire, even though demographically they were a minority.
>
> To recognize this Muslim suffering is not to diminish Armenian suffering, but to respect all tragedies regardless of the race, ethnicity or religion of the victims, and to place the Armenian tragedy in its proper context of a violent independence movement that failed at a tremendous human cost to Ottoman Armenians and Muslims alike.

> TCA supports United States foreign policy to encourage Armenia to accept Turkey's proposal to establish a historical truth commission, which would address the legal issue of whether either of the tragedies, Armenian or Muslim, constitute genocide, utilize Ottoman and WWI historians as expert witnesses, and secure absolute access to the archives of the relevant parties, particularly those of the Armenian Republic and Armenian Revolutionary Federation who carried out the Armenian Revolt.

This page also contains, without elaboration, links to lists of books and other resources that include the contra-genocide viewpoint and to a separate website that excerpts the work of 28 scholars whose work in whole or in part endorses the contra-genocide viewpoint.

24.     Plaintiff Sinan Cingilli is a freshman enrolled at the University of Minnesota. He resides in Minneapolis. A major reason for his enrollment is to develop critical thinking. Among other things, Mr. Cingilli is enrolled in Introduction to Political Philosophy.

25.     Defendant, Robert H. Bruininks, in his individual capacity, is the incumbent President of the University of Minnesota. He has worked at the University of Minnesota for over 40 years in various capacities and has held his position as President since November of 2002. He possessed authority to order CHGS to command the removal of Plaintiff's website from its list of blacklisted websites, and possesses authority to prevent the return of the list. On information and belief, Defendant Bruininks never visited Plaintiff's website and had no personal knowledge that any statement of fact made by TCA on its website is false. President Bruininks resides at Eastcliff, the traditional residence of UMN Presidents, located at 176 N. Mississippi River Boulevard, St. Paul, MN, 55104.

26.     Defendant Bruno Chaouat, in his individual capacity, is the Director of the Center for Holocaust and Genocide Studies at the University of Minnesota. On information and

belief, the Director held authority to list or delist websites on CHGS's "Unreliable Websites" list and, is responsible for CHGS publications.  He personally published a defamatory response on the CHGS website to TCA's allegations regarding the Unreliable Websites list.  Exhibit 7.  On information and belief, Defendant Chaouat never visited Plaintiff's website before he decided to dismantle the "unreliable websites" list, and had no personal knowledge that any statement of fact made by TCA on its website is false. His office is located at 756 Social Sciences Tower, 267 19th Ave. S., Minneapolis, MN 55455.

27.     Defendant, the University of Minnesota, is a public research university founded in 1851.  It has campuses in Minneapolis, St. Paul, Duluth, and elsewhere.  With over 50,000 students in attendance at the main campus, it ranks among the largest educational institutions in the United States.  It is an extremely well respected institution.  Nineteen out of the school's twenty graduate departments rank in the nation's top twenty according to the National Research Council.  The office of the general counsel at UMN is located at 360 McNamara Alumni Center, 200 Oak Street S.E., Minneapolis, MN 55455.

## STATEMENT OF FACTS

28.     Efforts to censor or suppress the contra-genocide viewpoint or silence any debate that questions whether genocide is the appropriate term for the Ottoman Armenian tragedy have a grim background.  For decades a historical and legal controversy has raged whether the mass civilian casualties among Ottoman Armenians amidst mass civilian casualties of Ottoman Muslims during World War I constituted the crime of genocide within the meaning of the Genocide Convention of 1948 and the United States criminal code, 18

U.S.C. § 1091.[1] The casualties occurred during wartime and during an Armenian rebellion in Eastern Anatolia against the Ottoman government in favor of its enemies, including Russia and France. An indeterminate number of Ottoman Armenians died from combat, disease, starvation, exposure, and massacres -- the same causes that occasioned the deaths of a staggering number of Ottoman Muslims in Eastern Anatolia.

29.     TCA underscores that it does not seek to minimize or disregard the genuine mass suffering of the Ottoman Armenians. Rather, the TCA seeks to explore fully the context of that suffering alongside the suffering endured by the Ottoman Muslims without prejudging the genocide question.

30.     Some Armenian American leaders and organizations have a long history of extreme reaction to those who decline to endorse the thesis that the Ottoman Armenian tragedy during World War I must constitute the crime of genocide and no other offense. Debate on the issue is consistently scorned as disrespectful of Armenians who died. The mere suggestion that academic discourse on the legal classification of the tragedy is warranted routinely provokes ad hominem attacks against the proponent, including the claim that to question the Armenian thesis makes the doubter complicit in genocide.

31.     Such verbal intimidations, however, pale in comparison to the Armenian violence of prior decades. During the 1970s and 1980s those who expounded the contra-genocide

---

[1] Genocide did not become a legally cognizable, distinct crime until after World War II, and found its first judicial expression in the indictment the 24 Nazi leaders at Nuremberg. Shortly thereafter it was codified in the United Nations Convention on the Prevention and Punishment of the Crime of Genocide, which was adopted by the U.N. General Assembly on December 9, 1948 and entered into force on January 12, 1951. 78 U.N.T.S. No. 1021, p. 277 (1951) (the "U.N. Genocide Convention"). The U.S. Senate has ratified the convention and the United States has enacted laws to give it effect. *See* 18 U.S.C. §§ 1901, 1902, also known as the Proxmire Act, as amended by PL 110-151 (2007), also known as the Genocide Accountability Act. Though Turkey is a member of the U.N. Genocide Convention, no party has ever raised the Armenian allegation of genocide against Turkey or any individual under the terms of the Convention, whether before the International Court of Justice or any other neutral arbiter.

thesis could expect threats, physical assaults, and even assassination. The house of Stanford Shaw, a tenured professor of history at Harvard and then U.C.L.A., was firebombed while he and his family slept on October 3, 1977. The bombing was in retaliation against the Professor's conclusion expressed in his book, *History of the Ottoman Empire and Modern Turkey*, that the relocation of Ottoman Armenian civilians from the war zone along the Russian frontier in 1915 was justified by the Armenian revolt against the Ottoman government.

32.     The grisly campaign of Armenian terrorism both within the United States and abroad between 1973 and 1986 found expression in 160 bomb attacks, 70 murders, 41 attempted murders, and 524 bodily woundings. Armenian terrorists took 105 civilian hostages and executed 12. The Armenian Secret Army for the Liberation of Armenia (ASALA) and the Justice Commandos of the Armenian Genocide (JCAG) claimed responsibility for nearly all of these acts. *See generally* Michael Guenter, *Pursuing the Just Cause of Their People: A Study of Contemporary Armenian Terrorism* (1986).

33.     Many Armenian Americans have celebrated these terrorists as heroes. For example, to show "moral support" for Hampig Sassounian, convicted of assassinating Turkish diplomat Kemal Arikan in Los Angeles, an "Evening for Hampig" was organized by a Sassounian Defense Committee and held at the Holy Cross Armenian Apostolic Church in Montebello, California on October 21, 1983. According to the Asbarez news bureau, more than $70,000 was raised. *See* http://www.asbarez.com/46446/more-than-70-000-raised-for-hampig-sassounian-defense-effort/ (last visited Nov. 15, 2010).

34.     On information and belief, CHGS's list of unreliable websites was first published on or about 2006 and evolved under its then director Stephen Feinstein. At no time has the

author of the blacklist been publicized or otherwise disclosed.

35.     The CHGS blacklist was counter-educational. No other institution of higher learning in the United States maintains a comparable list. On information and belief neither students nor professors generally of the University of Minnesota had ever clamored in favor of a blacklist of any sort when the blacklist was born.

36.     Director Feinstein appeared to have been significantly motivated to blacklist Plaintiff TCA's website by fervid exponents of the genocide thesis who could not countenance any expression of the contra-genocide viewpoint, perhaps fearing that it might persuade students or professors to give it due consideration. On information and belief, Director Feinstein did not visit the TCA's website or review any contra-genocide viewpoint resource listed on it before his death.

37.     On information and belief, CHGS or the University of Minnesota receives substantial donations from Armenian Americans, including the Cafesjian Family Foundation and Arsham Ohanessian. (The College of Liberal Arts have received donations from the Tashjian and Haratunian families). Former CHGS Director Feinstein, former CHGS interim Director Ellen Kennedy, and current CHGS Director Chaouat blacklisted websites in addition to Plaintiff TCA's to associate Plaintiff TCA with Holocaust deniers to damage its reputation and to conceal their counter-educational objective of suppressing the contra-genocide viewpoint.

38.     In a memorial service for Director Feinstein on May 12, 2008, Lou Ann Matossian, Director of the Cafesjian Family Foundation, and Director of Cultural and External Affairs, Armenian Cultural Organization of Minnesota, forthrightly explained Director Feinstein's denigration of the contra-genocide viewpoint and his complete and emotional embrace of the

Armenian thesis:

> Under Steve's direction, the list of CHGS contributions to Armenian Genocide scholarship, education, and outreach is long. Internationally renowned researchers, writers, and artists; conferences and seminars; and special events cosponsored with the Armenian Cultural Organization of Minnesota – Steve welcomed all these and more to the Minneapolis campus, often in partnership with the Cafesjian Family Foundation. In the multimedia realm, Steve and CHGS developed an unparalleled array of Web resources related to the Armenian Genocide. He also directed and was interviewed for the Twin Cities Public Television documentary *Armenian Genocide: 90 Years Later,* which was nominated for a regional Emmy award.

> Steve saw memory and the diaspora experience as matters of mutual concern that bound together the Jewish and Armenian communities. Speaking from a Jewish perspective on the Holocaust, he would say there was no event more similar than the Armenian Genocide, but there was a difference in terms of scholarship and recognition.

> Thus, Steve encouraged second- and third-generation Armenian survivors to understand their family story in wider terms, while sensitively introducing these hidden histories to educators and the public. He did more than sign the "126 Holocaust and Genocide Scholars" petition in the *New York Times,* reaffirming the Armenian Genocide as an incontestable historical fact and calling for its international recognition as such: he also held the original signatures at the CHGS office. In all these efforts, the presence of Ohanessian Chair Eric Weitz and visiting professor Taner Akçam was crucial to the center's success, "not only in scholarly research," as Steve recalled, "but also in television programs of local and national interest, radio, the Minnesota press, national magazines, and critical recognition all over the world." In January 2001, the Armenian Cultural Organization of Minnesota honored Steve for his outstanding contributions as a friend of the Armenian community.

39.    Taner Akcam, a controversial champion of the Armenian thesis, also effused over Feinstein at the ceremony.

40.    Arsham Ohanessian was a successful businessman and avid musician. He was devoted to maintaining the memory of what he called the Armenian Genocide. His gift to the University of Minnesota supports a wide range of educational, research, and public programs concerning ethnic and national conflicts and human rights.

41.     Eric Weitz, a faculty member affiliated with CHGS, is the current "Ohanessian chair," a position funded by Arsham Ohanessian's gift.

42.     The Cafesjian Family Foundation was established with a donation of more than fifty million dollars from Gerard Cafesjian, an Armenian American businessman and philanthropist. The Foundation owns a museum in Yerevan that displays Mr. Cafesjian's art collection, and it has sponsored a museum in Washington D.C. devoted to Armenian remembrance of the Armenian narrative of World War I.

43.     University of Minnesota students and professors read the following about the blacklisted websites on the Curriculum Model section of the University of Minnesota's website before November 18, 2010:

> **Unreliable Websites**
>
> We do not recommend these sites.  Warnings should be given to students writing papers that they should not use these sites because of [1] **denial,** [2] **support by an unknown organization, or** [3] **contents that are a strange mixture of fact and opinion.**  We also do not advise using sites with excessive advertising.

Exhibit 1.   Http://www.chgs.umn.edu/educational/curriculum.html (last visited Nov. 15, 2010) (emphasis added).

44.     The warnings mindlessly instructed students and professors to boycott an entire website even if only part of the website was "unreliable."  The blacklisted websites in addition to Plaintiff TCA's were as follows before November 18, 2010:

45.     Armenian Issue Blog (http://www.armenianissueblog.org/).  The Armenian Issue Blog, according to its website, is designed to facilitate an open discussion and provide information on the "Armenian issue." The identity of its author(s) is unknown. The blog contains a collection of articles primarily from other media outlets re-published as catalysts

for discussion. They address a myriad of topics, ranging from debatable issues and opinions regarding the alleged Armenian genocide to current events affecting Turkish interests and Turkish-Armenian relations. Visitors are encouraged to post their comments after each blog entry; however, few reply. The entire website appears to receive little feedback, suggesting a sparse online following. All previous entries and issues dating back as far as October 2006 are available in the website's archive. The publications reproduced by the blog appear to be professional, factual and non-strident. The website appears to offer scholastically credible information. The primary focus of this blog is the Armenian tragedy of World War I. No attempt has been made by CHGS to explain why the website was deemed unreliable and thus blacklisted.

46. Karabakh Conflict (http://www.karabagconflict.org/). This blog describes itself as a forum for the exchange of information and insights regarding the Nagorno-Karabakh conflict, and appears to follow the same template as the Armenian Issue Blog. Karabakh Conflict posts articles related to the territorial struggle over the disputed Nagorno-Karabakh region in Azerbaijan, as well as publications dealing with the state of relations between Armenia, Azerbaijan, and Turkey. Nothing on the website appears unprofessional or fraudulent. But the identity of its author is unknown. The clear focus of the blog is Nargorno-Karabakh, although the Armenian genocide thesis is also addressed. No attempt has been made by CHGS to explain why the website was deemed unreliable and thus blacklisted.

47. Assembly of Turkish American Associations ("ATAA") (http://www.ataa.org/). The ATAA is a fast-growing umbrella organization of Turkish American associations throughout the United States, Canada, and Turkey, dedicated to pursuing the interests of

Turkish Americans and friends of Turkey in Washington, D.C., and beyond. The site contains a page entitled "Reference Center," where it lists a series of articles on Armenian terrorism, the contra-genocide viewpoint on the Ottoman Armenian tragedy, the Armenian-Azerbaijan conflict, PKK/Kongra-Gel terrorism, and other Turkish related issues. The site contains articles from numerous leading academics and intellectuals. No articles or viewpoints appear lacking in educational or factual credibility. No attempt has been made by CHGS to explain why the website was deemed unreliable and thus blacklisted.

48.     Ermeni Sorunu. (http://www.ermenisorunu.gen.tr/). This site provides a detailed summary of the events related to the Ottoman Armenian relocations during World War I and challenges allegations of Turkish culpability in genocide. Almost the entire website is a direct copy of the "Armenian Allegations and the Facts" section of the Turkish government's Ministry of Culture and Tourism website. This website differs in also maintaining a section that attempts to organize campaigns by concerned individuals to oppose official endorsements of the Armenian thesis.

49.     Eraren – Institute for Armenian Research (http://www.eraren.org). The Institute of Armenian Research is a privately funded think-tank that aims to examine the Armenian question within a broad perspective, including its historical, political, legal and international relations dimensions. Within this framework, it analyzes the complex phenomenon of the "Armenian question" by utilizing the works of social sciences and history disciplines through a multi-disciplinary and inter-disciplinary approach. The institute prepares a daily bulletin that is available to all online visitors, which includes news collected daily from domestic and international news agencies and newspapers regarding the bilateral relations between Turkey and Armenia, the Armenian question, and the

Nagorno-Karabakh dispute. The website also permits visitors to read its two quarterly journals, *Review of Armenian Studies* and *Armenian Studies*, which analyze issues pertaining to the Ottoman Armenian controversy, Armenian Diaspora, and Armenian domestic and foreign policy. In addition, the site prompts visitors to continue educating themselves on these issues through a suggested readings page and another list of relevant articles. Finally, the website presents links to Turkish government departments, think thanks, universities, and sites that focus on the Armenian Question and Crimes Against Humanity. This is a site replete with links to external sources that appear valid. Its focus is almost exclusively the Ottoman Armenian tragedy of World War I. No attempt has been made by CHGS to explain why the website was deemed unreliable and thus blacklisted.

50.     Armenian Genocide Debate (http://www.armeniangenocidedebate.com/). This site describes itself as a non-partisan independent organization of historians, researchers, and scholars who research the Armenian Issue, report on the history, and explain events and peoples and persons involved in these events. It states: "Research continuously changes, and denying or promoting an Armenian Genocide is not the answer, because one day the scientific consensus may be to deny, the next day it may be to promote; therefore, a conclusion based on historians' consensus has not yet occurred and AGD does not take sides." This website leaves the Armenian thesis open to debate, which, according to prominent Armenian leaders and organizations, makes it complicit in genocide. No attempt has been made by CHGS to explain why the website was deemed unreliable and thus blacklisted.

51.     Republic     of     Turkey     Ministry     of     Culture     and     Tourism (http://www.armeniangenocidedebate.com/).     The Turkish government's Ministry of

Culture and Tourism contains a section entitled, "Armenian Allegations and the Facts," which provides detailed information regarding the events before, during, and after the alleged occurrence of the Armenian genocide. It contains sections entitled "Turco-Armenian Relations," "How the Armenian Issue Came About," "Massacres of the Turks by the Armenians," "April 24, 1915," "Relocation," "Armenian Terrorism," "Turkish Diplomats Killed by Armenian Terrorists," "Important Questions and Answers," "Chronology," "Album," "Archive and Documents," and "References." This section and the website as a whole brim with professionalism. The website also contains a detailed section entitled, "The Deportees of Malta and the Armenian Allegations," which describes the event immediately following World War 1 where Turkish leaders were imprisoned on Malta due, in part, to allegations of war crimes by Armenian informers. The section relies heavily on the book "The Deportees of Malta and The Armenian Allegations," written by Bilal N. Simsir, the Ambassador Member of the Turkish Historical Society, and published by The Ministry of Foreign Affairs. This website carries the earmarks of serious research and an academic approach. No attempt has been made by CHGS to explain why the website was deemed unreliable and thus blacklisted.

52.     Republic of Turkey Ministry of Foreign Affairs (http://www.mfa.gov.tr/). The Ministry of Foreign Affairs website offers a link entitled, "Armenian Allegations Concerning the 1915 Events," which contains a large volume of articles, research reports, speeches, and historical documents related to the Ottoman Armenian tragedy. This includes documents and speeches from government and non-government sources from Turkey and abroad, including Israeli Prime Minister Shimon Peres, U.N. Secretary General Ban-Ki Moon, and official statements from the British government. No attempt has been made by

CHGS to explain why the website was deemed unreliable and thus blacklisted.

53.     Armenian Genocide Hoax (http://www.armeniangenocidehoax.com/).  This website contains a link to www.genocide.am, the official website of an organization apparently based in the Republic of Armenia that promotes recognition of the genocide thesis, not its denial.   The following description of the website by CHGS wildly distorts its actual content: "This site's title is somewhat misleading because, instead of presenting the Armenian genocide as fakery, it focuses on the semantic argument that Armenians were the victims of massacres but not genocide. 'The genocide label is simply propaganda to associate Turks with evil & is a form of Anti-Turkism,' the site argues. Its anonymous writers present the massacres as occurring in the midst of a frenzied civil war fought along ethnic lines, posing the rhetorical question, 'When a nation loses a rebellion in a civil war, what better way to seek revenge than to claim it was genocide?'" CHGS' mischaracterization underscores the sophomoric nature of the blacklist itself.  It declares both exponents and opponents of the Armenian thesis unreliable, which is nonsensical.

54.     SPLC (Southern Poverty Law Center) Intelligence Report. (http://www.splcenter.org/get-informed/intelligence-report).  Here again CHGS appears to have listed as unreliable a website that contains an article, "State of Denial," that promotes the genocide thesis.  If one visits the article, however, it is prominently preceded by a retraction and apology.  It reads:

> **Retraction and Apology** In the summer 2008 issue of its *Intelligence Report*, the Southern Poverty Law Center reported that Guenter Lewy, a professor emeritus at the University of Massachusetts, was part of a network of persons, financed by the Government of Turkey, who dispute that the tragic events of World War I constituted an Armenian genocide. We now realize that we misunderstood Professor Lewy's scholarship, were wrong to assert that he was part of a network financed by the Turkish Government, and were wrong to assume that any scholar who challenges

the Armenian genocide narrative necessarily has been financially compromised by the Government of Turkey. We hereby retract the assertion that Professor Lewy was or is on the Government of Turkey's payroll.

To our knowledge, Professor Lewy has never sought to deny or minimize the deaths of Armenians in Ottoman Turkey; nor has he sought to minimize the Ottoman regime's grievous wartime miscalculations or indifference to human misery in a conflict earmarked by widespread civilian suffering on all sides. What he has argued in his book, *The Armenian Massacres in Ottoman Turkey: A Disputed Genocide*, and elsewhere is that the present historical record does not substantiate a premeditated plan by the Ottoman regime to destroy because of ethnicity, religion, or nationality, as opposed to deport for political-military reasons, the Armenian population. In this view, he is joined by such distinguished scholars as Professor Bernard Lewis of Princeton University. As additional troves of archival information come to light, Professor Lewy advocates greater study of this contentious subject.

We deeply regret our errors and offer our sincerest apologies to Professor Lewy.

Professor Lewy adds the following comment:

"The SPLC has made important contributions to the rule of law and the struggle against bigotry. Thus I took no pleasure in commencing legal action against it. But the stakes, both for my reputation as a scholar and for the free and unhindered discussion of controversial topics, were compelling. It must be possible to defend views that contradict conventional wisdom without being called the agent of a foreign government."

*State of Denial,* http://www.splcenter.org/get-informed/intelligence-report/browse-all-issues/2008/summer/state-of-denial (last visited Nov. 15, 2010).   It is unclear whether CHGS found the SPLC website unreliable or the retraction and apology.   Confusingly, CHGS only stated, "All four of SPLC's descriptions are worth quoting."

55.   Republic of Turkey, Grand National Assembly of Turkey (Turkish Parliament) (http://www.tbmm.gov/).  This link appears broken.

56.   Republic   of   Turkey,   Turkish   General   Staff   (Armed   Forces)

(http://www.tsk.mil.tr/).   This website contains a section entitled, "Armenian Issue," which offers visitors numerous documents related to the alleged Ottoman Armenian tragedy. One recreates the report of Colonel Kazim Karabekir, the Ottoman Army's 1st Caucasus Corps Commander, informing about a massacre committed by Armenians. Another document contains General Talat's "Order of Arrest of Armenian Committees." It also provides a list of Armenians serving in the Ottoman Army, a distribution of the people who were to be relocated and distanced from the war zone, photos of Turks killed or injured during that period, and a description of the coercive political circumstances necessitating the relocation and transfer of the Armenians. The section later offers a 36-page 2007 research paper by Professor Hikmet Ozdemir entitled "Issues Missed in the 1915 Armenian Debate." The closest thing to an explanation for the inclusion of this official website is an offhanded reference to the fact that therein, "Most of the denialist material is in Turkish."

57.     Wikipedia (http://www.wikipedia.org).   This is a free, collaborative online encyclopedia that utilizes the open editing model called "wiki" where every article may be edited anonymously or with a user account, while only registered users may create a new article. No article is owned by its creator or any other editor, or is vetted by any recognized authority; rather, the articles are collectively owned by a community of editors. When changes to an article are made, they become available immediately before undergoing any review, whether they are erroneous, misguided or nonsensical.   An investigation reported in the journal *Nature* in 2005 suggested that for scientific articles Wikipedia came close to the level of accuracy of *Encyclopedia Britannica* and had a similar rate of "serious errors." The CHGS explains their inclusion of Wikipedia as

follows: "Wikipedia [is unreliable] for anything related to the Holocaust & Genocide, because of the nature of the subject matter & contested history, can be unreliable." On information and belief, Wikipedia was blacklisted because of the risk that contra-genocide views might be posted.

58.     Isurvived.org (http://www.Isurvived.org). This amateurish website provides information on the Holocaust of European Jewry during the Second World War. It is poorly organized, with information cluttered and difficult to find. It is, in prominent part, a compilation of images of and quotes about Jews in Europe from the 1930s and the 1940s. The CHGS describes Isurvived.org as follows: "Very combative & arrogant site that can be classified as a denial site, with little original material, whose alleged author has been exposed as supporting a hoax organization under the guise of being survivor-oriented. It has no sense of scholarship or historiography. "

59.     Focal Point Publications (http://www.fpp.co.uk/). This website is owned and operated by infamous British Holocaust denier David Irving. CHGS called Irving the "Number one Holocaust denier." It contains links to free online versions of several of Irving's "best" books on the subject, as well as information on his legal battles throughout Europe.

60.     Institute for Historical Review (http://www.ihr.org/). The Institute for Historical Review, according to its website, works to promote peace, understanding and justice through greater public awareness of the past, and especially socially-politically relevant aspects of twentieth-century history. It strives above all to increase understanding of the causes, nature and consequences of war and conflict. It views itself as an educational, public interest research and publishing center that is non-partisan, non-ideological, and

non-sectarian. It is recognized by the U.S. Internal Revenue Service as a 501(c)(3) not-for-profit organization. The site covers speeches from Holocaust deniers, such as David Irving and Mark Weber. Some books suggested to the reader are "Revisionist Viewpoints," "Debating the Holocaust," and "The Founding Myths of Modern Israel." The content has a pro-Nazi undertone. CHGS calls the Institute for Historical Review a "California based denier organization."

61.     Ernest Zundel denial site (http://www.zundelsite.org/).  This is an unprofessional and poorly crafted website that touts an anti-Semitic viewpoint. The theme is to question the Holocaust.  No explanation was given by CHGS for its inclusion.

62.     About.com     (http://history1900s.about.com/library/holocaust/blholocaust.htm). This website provides an "online neighborhood of hundreds of helpful experts, eager to share their wealth of knowledge with visitors" about a myriad of subjects. All content is created by About.com's network of expert 'Guides'. The website is saturated with advertising, a fact that CHGS noted in its description.

63.     The Holocaust – A Tragic Legacy (http://library.advanced.org/12663/).  This link appears broken.

64.     Castle Hill Publishers (http://www.vho.org/tr/2001/1/tr05comp.html).  This site, according to its author, strives to "scientifically investigate historical events, particularly those of the 20[th] century, without limitations imposed by dogmas or axioms." It also aims to defend human rights, to combat discrimination (especially when it is directed against the German people), and to further public debate about the happenings surrounding the Holocaust. The site offers revisionist information to visitors, with downloadable articles and books entitled, "The Myth of Holocaust Compensation," "Lectures on the Holocaust,

Controversial Issues Cross Examined," and "Dissecting the Holocaust. The Growing Critique of 'Truth' and 'Memory.'" It educates visitors about publications censored around the world for denial of the Nazi Holocaust, solicits donations, and provides news that supports its provocative views. CHGS called this a "revisionist website."

65.     Utah's            Independent            Media            Source (http://utah.indymedia.org/news/2005/12/12654_comment.php).  This website labels itself as a non-commercial, democratic collective of bay area independent media makers and media outlets, and serves as the local organizing unit of the global "Indymedia" network. The site is a forum for numerous fringe ideas and opinions, including those related to anti-globalization, anti-capitalism, and anti-Semitism. CHGS  provided a link to a revisionist article on this website that attempts to question the occurrence of a Holocaust during World War II. This article appears to have received both support and scorn from visitors, with many denouncing it as hateful, pro-Nazi drivel.  The website provides numerous hotlinks on the left hand side to issues ranging from "9-11 and War on Terror" and "Iran" to "Women's Rights, Issues" and "War on Drugs." Authors are listed for each article. CHGS calls this website a "Revisionist site [that] appears to be derived from World Church of the Creator, a racist organization."

66.     Introduction to Armenian Issue (http://www.ermenisorunu.gen.tr/english/intro/). This link appears broken.

67.     Tall Armenian Tale (http://www.tallarmeniantale.com/index.htm).   This site features contra-genocide views on the Ottoman Armenian tragedy.  The content is mostly created by the site's anonymous author, who CHGS elsewhere has exposed.  The style is clumsy.  The website is cluttered with quotes. CHGS describes Tall Armenian Tale as "A

site dedicated to denying the Armenian genocide that also attacks academic discourse on the subject."

68.     Armenian Reality (http://www.armenianreality.com).  This link appears broken.

69.     Q     &     A     on     the     so-called     Armenian     Genocide (http://www.ocf.berkeley.edu/~turk/ermeni/brochure1text.htm).   This website, consisting of a single page, contains 11 questions and answers on the genocide thesis, generally taking the contra genocide viewpoint. No explanation was given by CHGS for its inclusion other than its failure to disclose an author.

70.     Armenian Genocide Resource (http://armenians-1915.blogspot.com/).   This website touts itself as "the largest resource center on Armenian Genocide, Covering 3900+ Articles, 212+ Free E-Books & Documents, Lobbying Tutorials, Diaspora Papers, Historical Newspapers Screen Shots Dates Back to 1800's, 70+ Videos, Eyewitness Accounts, Regular Updates." The website contains a wide range of letters, emails, articles, and news stories that promote the contra-genocide viewpoint. Posting can range from letters written by concerned Turkish students to articles published in newspapers. Proper citations appear to be the norm throughout the maze of articles and other materials available on the website.  CHGS described this website as "A denialist site from Australia using for its masthead the name of a well known legitimate educational entity in the U.S. to propagate denialist material much like the site Tall Armenian Tale. This site promotes Armenian Genocide denial & a conspiracy theory that affirming the Armenian Genocide is part of a secret Armenian plot to seize Turkish territory."

71.     Ministry of Culture and Tourism (http://www.kultur.gov.tr/TR/ana-sayfa/1-0/20101117.html).  This is the official website for the Turkish Ministry of Culture and

Tourism. The link is to the Turkish version, but one can easily find the site's English language mirror. The vast majority of the information that it contains is completely unrelated to the Ottoman Armenian history. It consists mostly of sightseeing suggestions and historical information on other subjects. However, a few pages on the website are dedicated to presenting a logical and well-sourced argument defending the contra-genocide viewpoint. CHGS provided no explanation for this website's inclusion.

72.     Republic of Turkey, Ministry of Foreign Affairs (http://www.mfa.gov.tr). This is yet another official agency of the Turkish government whose purpose appears to be disseminating news on a range of international affairs in which Turkey is involved. There is only one page out of a great many that is devoted to Armenian allegations concerning the events of 1915, and it contains links to articles and primary source documents that appear academically reputable. No explanation was given for this website's inclusion.

73.     The Unreliable Website blacklist of Defendants was conspicuously devoid of any websites that address genocides other than the Ottoman Armenian tragedy and the Holocaust. The CHGS has established three funds to which patrons can donate funds to support its activities: the Armenian Genocide Education Fund, the Holocaust Lecture Series Fund, and the CHGS General Fund. The center's narrow preoccupation suggests an ulterior, non-educational motivation.

74.     The prime minister of Ukraine recently claimed that *Holdomor*, the great hunger and famine culminating in the deaths of millions of Ukrainian peasants imposed by Josef Stalin, did not constitute genocide under international law. *See Yanukovych Says Ukrainian            Famine            Not            Genocide,* http://ceeuropeaninfo.blogspot.com/2010/04/yanukovych-says-ukrainian-famine-not.html

(last visited Nov. 15, 2010). The late Russian scholar Alexander Solzhenitsyn agreed with this "denialist" interpretation publicly and in full. *See Solzhenitsyn Battles Illness to Complete Final Volumes,* http://www.guardian.co.uk/books/2008/apr/06/news.russia (last visited Nov. 15, 2010). Despite these "denialist" claims, the websites that published them were nowhere to be found on the Unreliable Website list of Defendants. The omission exemplifies the Humpty Dumpty nature of the "denial" category for Defendants' blacklist—it meant whatever Defendants wanted it to mean.

75.     Whether the Japanese 1937 Nanking massacre or "Rape of Nanking" constituted genocide is also hotly contested. At present, many Japanese maintain that the government of Emperor Hirohito did not kill and rape to destroy Chinese because of their nationality. Yet not one of the many Japanese websites that contest whether the massacre constituted genocide was blacklisted as unreliable by Defendants.

76.     Similarly, no websites were listed by Defendants that pertain to the recently adjudicated genocides in Rwanda or Srebrenica. The same is true for the claimed genocide of the Herero in Southwest Africa by Germany or King Leopold II's genocide of Congolese in the Belgian Congo.

77.     Nagorno-Karabakh is a territory in Azerbaijan that is currently occupied by Armenia by force of arms, an action condemned in four resolutions by the United Nations Security Council. During the war initiated by Armenia and Armenians in the local population, Azerbaijani civilians were slaughtered *en masse*, particularly in the town of Khojaly. The Government of Azerbaijan has accused Armenia and Armenians in Nagorno-Karabakh of genocide for the massacres in Khojaly. A website, http://www.azergenocide.org, has been created to pursue recognition of this thesis. Every

organization that denies the Azeri genocide claim denies an alleged genocide, and therefore facially meets the criteria for blacklisting that had been articulated by Defendants. The Armenian National Committee of America ("ANCA"), an organization frequently cited with approval by CHGS faculty members, features a website that disputes the Azeri genocide narrative. Yet ANCA website escaped blacklisting by Defendants.

78.     Plaintiff TCA was formed in 2007. On information and belief, Plaintiff's website was blacklisted by Defendants in 2007 or 2008 as unreliable specifically because of its contra-genocide viewpoint resources that Defendants wished to suppress. Defendants, Plaintiffs surmise believed TCA's website was engaged in "denial" and featured a "strange mixture of fact and opinion." Plaintiff TCA received no notice that its website would be blacklisted. Plaintiff TCA received no opportunity to respond. Plaintiff TCA was not provided the name of the person or persons who determined to blacklist its website.

79.     Soon after Plaintiff learned of the Defendants' blacklisting of its website, it sought resolution of the matter without resort to litigation. In late 2008 and early 2009, TALDF, on behalf of Plaintiff TCA, protested Plaintiff's inclusion on the blacklist (as well as the blacklist generally) in a letter to the office of University of Minnesota President Robert Bruininks, which was also copied to CHGS. Exhibit 2, Exhibit 3. The TALDF letter provided notice to the University's administrators of TCA's defamation claim based on the blacklisting of its website.

80.     The University's own mission statement provides: "In all of its activities, the University strives to sustain an open exchange of ideas in an environment that embodies the values of academic freedom, responsibility, integrity, and cooperation; that provides

an atmosphere of mutual respect, free from racism, sexism, and other forms of prejudice and intolerance…" The Board of Regents Policy on Academic Freedom and Responsibility states in part: "Academic freedom is the freedom to discuss all relevant matters in the classroom, to explore all avenues of scholarship, research, and creative expression, and to speak or write without institutional discipline or restraint on matters of public concern…." As noted above, Mark Rosenberg, the University's general counsel, stated to the University of Minnesota Daily: "Those sites were considered unreliable for students and shouldn't be used by students when they are writing papers and such." And Defendant on or about November 24, 2010, on the CHGS website derided the sites as "sources of illegitimate information."

81.     TALDF's demand that Plaintiff's website be removed from Defendants' blacklist was rebuffed in a letter by the University's Associate General Counsel, Mr. Brent R. Benrud.  Exhibit 4.

82.     Blacklisting viewpoints impairs rather than advances learning. In *Sweezy v. New Hampshire*, 354 U.S. 234 (1957), the Supreme Court recognized that, "The essentiality of freedom in the community of American Universities is almost self-evident.  […] Particularly is that true in the social sciences, where few, if any, principles are accepted as absolutes.  Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise, our civilization will stagnate and die." Justice Anthony Kennedy recently elaborated in a concurring opinion in *Christian Legal Society Chapter of University of California Hastings College of Law v. Martinez* (June 24, 2010)(sl.op.4): "A vibrant dialogue is not possible if students wall themselves off from

opposing points of view…[I]n a university community…speech is deemed persuasive based on its substance, not the identify of the speaker.  The era of loyalty oaths is behind us."

83.    On information and belief, CHGS is the only educational institution in the entire United States to warn students away from visiting a list of allegedly unreliable websites. On or about summer of 2010, Ellen J. Kennedy, Ph.D., then "Interim Director" of the CHGS, confirmed in a phone call placed by TALDF that she knew of no other comparable blacklisting of websites anywhere in the United States.

84.    CHGS' warning to students and professors against visiting or using Plaintiff's website contradicted the declared foundational principles of the University of Minnesota. Its mission is to teach students to think critically—a faculty essential to enlightened democratic discourse. The Board of Regents' Code of Conduct for the University, published on December 8, 2006, declares in Subdivision 6, that, "Academic freedom is essential to achieving the University's mission.  Community members are expected to: promote academic freedom, including the freedom to discuss all relevant matters in the classroom, to explore all avenues of scholarship, research and creative expression and to speak and write as a public citizen without institutional discipline or restraint; and … defend intellectual honesty and freedom of inquiry and instruction; [and] to respect those with differing views…" Further, the Board of Regents' June 12, 2009 statement on Academic Freedom and Responsibility defines "Academic Freedom" as, "[T]he freedom to discuss all relevant matters in the classroom, to explore all avenues of scholarship, research, and creative expression, and to speak or write without institutional discipline or restraint on matters of public concern…" The Unreliable Websites list -- a euphemism for

suppressing the contra-genocide viewpoint available on Plaintiff's website -- betrayed both the word and spirit of the University's own Code of Conduct and its standards for Academic Freedom and Responsibility.  The flagrant contradiction fortifies the conclusion that the list advanced no bona fide educational goal.  It was a tool of indoctrination or propaganda that should have been an embarrassment to the University of Minnesota.

85.     And even the CHGS' own Armenian – Turkish Research Project recognizes that:

> Alongside Armenians, virtually every population group -- Muslims from the Caucasus and the Balkans, Greeks, Assyrian and Chaldean Christians, Jews, Kurds --experienced ethnic cleansings and massacres from the late nineteenth and well into the twentieth centuries. Those experiences have left deep traces of bitterness in the region and among diaspora populations.  Alternate histories -- of people of diverse ethnicities and religions in the very same region, who lived side by side in relative peace -- have often been forgotten.
> …
> The *Armenian-Turkish Research Project* is designed to foster scholarly research and increase public knowledge about the history and politics of ethnic and national conflict in the eastern Mediterranean, an area of critical strategic importance.

Thus, if education were the authentic reason behind the "Unreliable Websites" list, it would be patently obtuse to consider for blacklisting websites that place the Ottoman Armenian tragedy in context with the fate of Ottoman Muslims.

86.     In the words of John Stuart Mill in *On Liberty, Chapter 2*, "The opinion [that] … [a government or individual] attempted to suppress by authority may possibly be true. Those who desire to suppress it, of course deny its truth; but they are not infallible. They have no authority to decide the question for all mankind, and exclude every other person from the means of judging. To refuse a hearing to an opinion, because they are sure that it is false, is to assume that *their* certainty is the same thing as *absolute* certainty. All silencing of discussion is an assumption of infallibility. Its condemnation may be allowed

to rest on this common argument…" The CHGS list assumed infallibility, an assumption inconsistent with Defendants' professed educational endeavor.

87.     The "Unreliable Websites" list was introduced to students and professors with the academic equivalent of a skull-and-crossbones poison warning:  "We do not recommend these sites. Warnings should be given to students writing papers that they should not use these sites because of denial, support by an unknown organization, or contents that are a strange mix of fact and opinion.   We also do not advise using sites with excessive advertising."

88.     The CHGS omitted to describe with explicitness the consequences for students or professors who disregard its warning. But the omission did not detract from its practical effect of deterring visitations to Plaintiff's website and exposure to the contra-genocide viewpoint.  All warnings of this nature chill speech. The Unreliable Website listing of Plaintiff's website caused all or a substantial portion of Defendants' professors or students to eschew visiting the site to avoid the risk of an academic demerit, for instance, a reduced grade, a poor evaluation, or otherwise.   Defendants held the power to inflict these consequences.   In operation, the CHGS warning was tantamount to "informal censorship" of Plaintiff's contra-genocide viewpoint in violation of a clearly established First Amendment right as elaborated by the Supreme Court in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) of which a reasonable person would have known.

89.     On or about November 5, 2010, Plaintiff Cingilli arranged a meeting with the Director of the Center for Holocaust and Genocide Studies, Mr. Bruno Chaouat, to discuss visiting or using the blacklisted websites in conjunction with a research paper.   Mr. Chaouat described all the blacklisted sites as "denialist," and strongly discouraged their

use by Plaintiff Cingilli.   When directly asked by Plainitff Cingilli, Mr. Chaouat repeatedly refused to deny that there would be academic consequences for using the websites.  He even strongly discouraged using them to discredit or appraise their academic credibility.  Mr. Chaouat asked Plaintiff Cingilli why he would wish to use the blacklisted websites that the CHGS Director had "marked with a scarlet letter."

90.    Based on the conversation between Mr. Cingilli and Mr. Chaouat and the permanent warning on the CHGS website, Plaintiff Cingilli was afraid to use the CHGS blacklisted websites, including Plaintiff TCA's website, which ranked number 1 on the blacklist.

91.    On or about November 24, 2010, Mr. Chaouat issued a public response to two newspaper articles that reported Plaintiffs' view of the Unreliable Websites list.  Exhibit 7. The response was not a discretionary duty. As of November 29, 2010, the following message of Defendant Chaouat remains emblazoned atop the home page of the CHGS:

> "My staff and I have invested much effort in trying to update the Center's website. Part of this updating process bears on the educational section, and its listing of websites that CHGS perceives as unreliable sources of information for students and researchers. I decided to remove the section providing links to "unreliable websites." My rationale was quite simple: never promote, even negatively, sources of illegitimate information.
> During almost twenty years of working in higher education, I have never put a dubious source on a syllabus for my students, not even for the purpose of delegitimizing the source...
> On behalf of the CHGS, I want to reiterate that in accordance with the vast majority of serious and rigorous historians, the CHGS considers the massacre of Armenians during World War I as a case of genocide...
> Genocide and Holocaust denial is an important issue for CHGS..." (http://www.chgs.umn.edu/). Id.

With this publication, Defendant Chaouat reaffirmed his defamatory assertion of fact that

Plaintiff TCA's website was academically dishonest or illegitimate.  Defendant Chaouat

further asserted or insinuated that the previous blacklisting of Plaintiff TCA's website had

been for the purpose of "delegitimizing" it as a source available to students.  Defendant

Chaouat's response contradicts the November 19th letter to TALDF by Mr. Brent P.

Benrud, which attributed the removal of the list to Mr. Chaouat's belief that "students,

faculty members, and others should make their own assessments of the reliability of

websites and other sources of information." Exhibit 5.  On the contrary, Mr. Chaouat's

response reveals that the list's true purpose has always been the "delegitimization" of the

TCA website, and of every other website included on the CHGS website blacklist.

92.     The inclusion of Plaintiff TCA's website on Defendants' "Unreliable Websites"

list, and, Defendant's disparagement of TCAs' website as academically "illegitimate" in

context, communicated to a reasonable student or professor of the University of Minnesota

the false assertion that there are no credible scholars or facts that hold the contra-genocide

viewpoint.   Defendants made that assertion with ill-will towards Plaintiff and with

knowledge of its falsity or with reckless disregard of whether it was false or not.

93.     A significant purpose of the blacklisting of Plaintiff TCA's website and Defendant

Chaouat's marking it with a "scarlet letter" to "delegitimize[ ]" it was to dehumanize

Turkish Americans and Turks as a group who deserve retaliation for quarreling with the

Armenian thesis.

## COUNT I:  VIOLATION OF CONSTITUTIONAL DUE PROCESS - VAGUENESS

94.     Plaintiff re-alleges paragraphs 1-93 of the Complaint as if they were alleged anew.

95.     Defendants' categories of "denial", "support by an unknown organization" and

"strange mixture of fact and opinion" for blacklisting Plaintiff's website as unreliable

were unconstitutionally vague in violation a clearly established right of due process under the Fourteenth Amendment of which a reasonable person would have known.  Common persons must necessarily have guessed at their meaning; and, they invited arbitrary, capricious, or oppressive application against organizations or websites disliked by Defendants because of the viewpoints they espouse or publish.  The penalty to Plaintiff TCA for the blacklisting of its website was that its contra-genocide viewpoint was, in practical effect, blocked from Defendants' students and professors and blunted in its influence in the marketplace of ideas.

## COUNT II:  VIOLATION OF EQUAL PROTECTION

96.     Plaintiff re-alleges paragraphs 1-95 of the Complaint as if they were alleged anew.

97.     Defendants' application of its "denial", "support by an unknown organization" and "strange mixture of fact and opinion" standards for blacklisting Plaintiff's and other websites discriminated on the basis of viewpoint in violation of the clearly established constitutional right to equal protection under the Fourteenth Amendment as expounded in *Carey v. Brown*, 447 U.S. 455 (1980) and *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992), and their progeny, of which a reasonable person would have known.  In the application of Defendants' blacklisting standard, Defendants discriminated against Plaintiff's contra-genocide viewpoint based solely because of hostility towards the viewpoint.

## COUNT III:  VIOLATION OF CONSTITUTIONAL DUE PROCESS

98.     Plaintiff re-alleges paragraphs 1-97 of the Complaint as if they were alleged anew.

99.     Defendants blacklisted Plaintiff TCA's website as unreliable without notice or an opportunity to respond or to appeal.   The intended and predictable effect of the blacklisting of Plaintiff's website was to deter all or a substantial number of Defendants'

professors and students from visiting the website; and, from learning of and entertaining the contra-genocide viewpoint referenced on Plaintiff TCA's website. Defendants were the proximate cause of the deterrence and avoidance of Plaintiff's website by making the students and professors believe that if they visited the website they would risk material academic penalties or demerits. The Defendants' procedures employed in blacklisting Plaintiff's website deprived Plaintiff of its liberty of the opportunity to expose Defendants' students and professors to the contra-genocide viewpoint in violation of Plaintiff's clearly established constitutional right to due process under the Fourteenth Amendment as announced in *Wisconsin v. Constantineau*, 400 U.S. 433 (1971) and its progeny, of which a reasonable person would have known.

### COUNT IV: VIOLATION OF FREE SPEECH – SUPPRESSION OF SPEECH

100.    Plaintiff re-alleges paragraphs 1-99 of the Complaint as if they were alleged anew.

101.    Defendants' blacklisting of Plaintiff's website was for the specific purpose of suppressing the contra-genocide viewpoint. The blacklisting combined with Defendants' ominous warning to their students and professors to boycott Plaintiff's website or risk academic or educational penalty or retaliation effectuated an unconstitutional censorship of Plaintiff's website, including the contra-genocide viewpoint, among Defendants' students and professors in violation of the clearly established constitutional right to free speech as articulated by the Supreme Court in *Bantam Books v. Sullivan*, supra, and companion decisions, of which a reasonable person would have known.

### COUNT V: VIOLATON OF FREEDOM OF SPEECH – RIGHT TO RECEIVE

**INFORMATION**

102.     Plaintiffs' reallege paragraphs 1-101 as if they were alleged anew.

103.     Defendants' warning to Plaintiff Cingilli not to visit or use Plaintiff TCA's or other blacklisted websites violated his clearly established First Amendment right to receive information without an undue burden imposed by government of which a reasonable person would have known.  The First Amendment creates a right to receive information free from undue government burden. *Lamont v. Postmaster General*, 381 U.S. 301 (1965). And students enjoy a right of access to educationally suitable information free from viewpoint-based government censorship.  *Island Trees School District v. Pico*, 457 U.S. 853 (1982).

**COUNT VI:  DEFAMATION**

104.     Plaintiff re-alleges paragraphs 1-103 of the Complaint as if they were alleged anew.

105.     Defendants' blacklisting of Plaintiff TCA's website, in context, was intended by Defendants to communicate the false assertion that Plaintiff TCA's contra-genocide viewpoint as expressed on its website is tantamount to denying the Holocaust, i.e., no credible scholars or facts support the contra-genocide viewpoint; and, that Plaintiff's contra-genocide viewpoint reflects Plaintiff's bigotry or hatred towards Armenians. Defendants made that assertion about Plaintiffs with ill will towards Plaintiff TCA and with knowledge of the assertion's falsity or with reckless disregard of whether it was or is false or not.

106.     The assertions referred to in paragraph 105 were defamatory because they imputed to Plaintiff scholastic fraud, bigotry or hatred towards Armenians, and callousness towards

Armenian deaths in World War I, which lowered Plaintiffs' esteem in the community.

107.    Defendants' publication of the assertion caused Plaintiff TCA general and special damages.  Defendants' knew, anticipated, foresaw, and intended that the assertion would be read throughout the United States and the world and would damage Plaintiff TCA's reputation.  The assertion has adversely affected Plaintiff TCA's credibility, speaking, writing, media, and fund raising opportunities and the ability to influence government and private thinking about how to characterize and interpret Ottoman Armenian history.

## COUNT VII – DEFAMATION

108.    Plaintiffs reallege paragraphs 1-107 of the Complaint as if they were alleged anew.

109.    Defendant Bruno Chaouat's defamatory assertions that Plaintiff TCA's website was an "illegitimate" source of information for students or "dubious" were not made as a discretionary duty of Chaouat but were made with ill will towards Plaintiff TCA and with knowledge of the assertions' falsity or with reckless disregard of whether it was or is false or not.

110.    Defendant Chaouat's assertions were defamatory because they imputed to Plaintiff scholastic fraud, bigotry or hatred towards Armenians, and callousness towards Armenian deaths in World War I, which lowered Plaintiffs' esteem in the community.

111.    Defendants' publication of the assertions caused Plaintiff TCA general and special damages.  Defendants' knew, anticipated, foresaw, and intended that the assertion would be read throughout the United States and the world and would "delegitimize" Plaintiff TCA and damage Plaintiff TCA's reputation.  The assertions have adversely affected Plaintiff TCA's credibility, speaking, writing, media, and fund raising opportunities and the ability to influence government and private thinking about how to characterize and

interpret Ottoman Armenian history.

## **PRAYER FOR RELIEF**

112.   Plaintiffs demand judgment for compensatory damages against individual Defendants Bruininks and Chaouat on Counts I-V according to proof.

113.   Plaintiffs demand judgment against Defendant University of Minnesota on Counts VI and VII and Defendant Chaouat on Count VII with awards of compensatory damages plus pre-judgment and post-judgment interest according to proof.

114.   Plaintiffs ask for an award of attorneys' fees under the Civil Rights Attorney's Fees Award Act of 1976, 42 U.S. C. 1988.

115.   Plaintiffs request such additional relief that this Court finds appropriate.


Respectfully submitted,


_____
Bruce Fein
DC Bar No. 446615
*Pro Hav Vice*
1025 Connecticut Ave., NW, Ste 1000
Washington, D.C. 20036
Telephone:  (703) 963-4968
Facsimile:  (202) 478-1664
Email:  bruce@thelichfieldgroup.com
Attorney for TALDF


      /s/

_____
David Saltzman
DC Bar No. 426201
655 15th Street, NW
Suite 225-F
Washington, DC 2005-5701
Office:  (202) 637-9877
Mobile:  (202) 637-9876

Email:  dsaltzman@turklaw.net
Attorney for TALDF

/s/
_____
LARRY FROST
Paladin Law, PLLC
5113 W 98th St #111
Bloomington, MN 55437
Telephone: (612) 839-5132
Email:  larry.a.frost.atty@comcast.net
Local counsel for TALDF