UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

TURKISH COALITION OF AMERICA, INC.,
and SINAN CINGILLI,

Case # 10-CV-4760 (DWF/FLN)

Plaintiffs,

**MEMORANDUM OF LAW
IN SUPPORT OF
DEFENDANTS' MOTION
TO DISMISS**

v.

ROBERT BRUININK, BRUNO CHAOUAT,
and THE UNIVERSITY OF MINNESOTA,

Defendants.

## I. INTRODUCTION

This matter arises from statements posted on the website for the Center for Holocaust and Genocide Studies (CHGS) at the University of Minnesota (the "University"). The statements included comments regarding the reliability of information contained on certain websites, including the website for plaintiff Turkish Coalition of America, Inc. (TCA). The plaintiffs claim the statements violated their constitutional rights to free speech, equal protection, and due process; and that the statements constituted defamation. Their Complaint includes 42 U.S.C. § 1983 claims, as well as state law defamation claims against the University and two University officials in their individual capacities.

The defendants deny any wrongdoing towards the plaintiffs. The statements at issue were statements of opinion and/or commentary protected by principles of Academic Freedom. On their face, the statements cannot support a defamation or § 1983 claim.

The defendants seek the dismissal of the plaintiffs' Complaint pursuant to Rule 12 of the Federal Rules of Civil Procedure on various grounds, including failure to state a claim upon which relief can be granted, lack of standing, and qualified immunity.

## II. STATEMENT OF FACTS

For purposes of their motion, the defendants assume that all of the following facts, as alleged in the plaintiffs' Complaint, are true.  The defendants reserve the right to dispute these facts should this matter proceed beyond the defendants' motion.

Plaintiff Turkish Coalition of America (TCA) is a not-for-profit corporation organized under the laws of Massachusetts, with its main office in Washington, D.C.[1] Plaintiff Sinan Cingilli is a freshman student enrolled at the University.[2]

The University is a public research university founded in 1851 with campuses in Minneapolis, St. Paul, Duluth, Rochester, and elsewhere in Minnesota.[3]   Defendant Robert H. Bruininks is the President of the University.[4] Defendant Bruno Chaouat is the Director of the Center for Holocaust and Genocide Studies (CHGS), a collegiate center[5]

---

[1]  Complaint ¶ 19.

[2]  Complaint ¶ 24.

[3]  Complaint ¶ 27.

[4]  Complaint ¶ 25.

[5]  This Court may take judicial notice that, pursuant to University policy, a collegiate center is "an entity established to support and advance research, education, or public engagement that includes mostly members from the same college, although the work may be of an interdisciplinary nature."  (See University Procedure *Collegiate and Intercollegiate Centers:  Establishing, Operating and Evaluating* set forth at:

in the College of Liberal Arts (CLA) at the University.[6]   Prof. Chaouat became the

Director of the CHGS in July 2010.[7]

The CHGS maintains that the killing of Ottoman Armenians during World War I

constituted genocide.[8]   The TCA maintains that the issue of whether the killing of

Ottoman Armenians during World War I constituted genocide has not been determined,

and further maintains that it is unlikely a charge of genocide could be sustained.[9]   The

TCA's position is described on its website.[10]

From 2006 through November 18, 2010, the "Curriculum Models" section of the

CHGS website included the following statement under the heading "Unreliable

Websites" (the "Unreliable Websites Statement"),

> We do not recommend these sites.  Warnings should be given to students
> writing papers that they should not use these sites because of denial,
> support by an unknown organization, or contents that are a strange mix of
> fact and opinion.  We also do not advise using sites with excessive
> advertising.[11]

---

http://www.policy.umn.edu/Policies/Education/Colleges/INTERDISCIPLINARY_PROC
02.html.)

[6]  Complaint ¶ 26.

[7]  Complaint Exhibit 7.

[8]  Complaint Exhibit 7.

[9]  Complaint ¶ 3, 23.

[10]  Id.

[11]  Complaint ¶ 8, 43, Exhibit 1

The statement was followed by a list of websites, including the TCA website.[12]   The unreliable website list was added to the CHGS website in or about 2006.[13]   At that time, Stephen Feinstein served as CHGS Director.[14]

In late 2008 and/or early 2009, the Turkish American Legal Defense Fund (TALDF), a side-project of the TCA, sent letters to President Bruininks and Interim CHGS Director Ellen Kennedy protesting the inclusion of the TCA website on the unreliable websites list.[15]   By letter from its legal counsel, the University responded that the CHGS had the right to express its opinion regarding the reliability of the information set forth on the various websites, that the inclusion of the TCA website on the unreliable websites list did not restrict TCA's right to express its views, and that the TALDF's demand to remove the TCA website from the list was denied.[16]

On or about November 5, 2010, Mr. Cingilli met with Prof. Chaouat to discuss using websites on the unreliable websites list in conjunction with a research paper.[17] Prof. Chaouat discouraged Mr. Cingilli from using the websites.[18]   When asked by Mr.

---

[12]  Id.

[13]  Complaint ¶ 34.

[14]  Id.

[15]  Complaint ¶ 79, Exhibit 2, Exhibit 3.

[16]  Complaint ¶ 81, Exhibit 4.

[17]  Complaint ¶ 88.

[18]  Id.

Cingilli, Prof. Chaouat refused to deny there would be adverse academic consequences for using the websites.[19]

On or about November 18, 2010, the CHGS removed the unreliable website list from its website.[20] In a November 19, 2010, letter to the TALDF, the University, through its legal counsel, indicated that there are no plans to return to the list to the website at any time in the future.[21]

On or about November 24, 2010, Prof. Chaouat posted the following "Response to 'Unreliable Websites'" on the CHGS website (the "Chaouat Statement").

> This statement is in response to articles published in the Pioneer Press on 11-19-2010 and in the Minnesota Daily on 11-23-10 regarding the removal of the "unreliable websites" from the website of the Center for Holocaust and Genocide Studies (CHGS) at the University of Minnesota
>
> I assumed directorship of CHGS in July 2010. Since then, I have focused on promoting the Center's mission of research, education and outreach. I have been speaking with the community and with colleagues on campus to communicate the new initiatives and intellectual orientation of the Center.
>
> My staff and I have invested much effort in trying to update the Center's website. Part of this updating process bears on the educational section, and its listing of websites that CHGS perceives as unreliable sources of information for students and researchers. I decided to remove the section providing links to "unreliable websites." My rationale was quite simple: never promote, even negatively, sources of illegitimate information.
>
> During almost twenty years of working in higher education, I have never put a dubious source on a syllabus for my students, not even for the purpose of delegitimizing the source. The decision to remove the links to

---

[19] Id.

[20] Complaint ¶ 15.

[21] Complaint ¶ 16.

"unreliable websites" was made before the Turkish Coalition of America began its efforts to intimidate CHGS into removing the links. The links were replaced with legitimate information devoted to the history, ideology and psychology of Holocaust and genocide denial.

On behalf of the CHGS, I want to reiterate that in accordance with the vast majority of serious and rigorous historians, the CHGS considers the massacre of the Armenians during World War I as a case of genocide. To insinuate, as the articles published in the newspapers mentioned above, that the mission of CHGS is somehow influenced and biased by donors' money is incorrect.

Genocide and Holocaust denial is an important issue for CHGS. When I took over the direction of the Center, I put together a lecture series on this very question. This series will begin in 2011 and will continue in the academic year of 2011-12. I invite all persons interested in the issue of genocide and Holocaust denial to attend the lectures and participate in our discussions.[22]

The TCA filed this action on November 30, 2010.

## III. ARGUMENT

On the face of the Complaint, the plaintiffs cannot support their claims against the defendants. The defendants' statements were protected by Academic Freedom. The plaintiffs cannot state First Amendment, due process, equal protection, or defamation claims. The plaintiffs lack standing. The plaintiffs' claims against President Bruininks and Prof. Chaouat in their individual capacities are barred by the doctrine of qualified immunity. For all of these reasons, the plaintiffs' claims should be dismissed.

### A.   The defendants have the right to express their views.

The statements made by the CHGS and Prof. Chaouat were protected by Academic Freedom. "Academic freedom, though not a specifically enumerated

---

[22] Complaint ¶ 18, 91 Exhibit 7.

constitutional right, long has been viewed as a special concern of the First Amendment."[23]   For universities, Academic Freedom includes the "four essential freedoms ... to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study."[24]  For university faculty members it includes the right to engage in scholarly activities free from unreasonable intrusion or restriction.[25]

The plaintiffs' claims in this case arise from the Unreliable Websites Statement and the Chaouat Statement.  On their face, they are statements are expressions of the CHGS's and Prof. Chaouat's views regarding the validity of the information set forth on the TCA website, and whether the information should be used in scholarly research.  The CHGS and Prof. Chaouat have the right to decide which sources of information they consider valid for purposes of scholarly research.  They have the right to comment on and critique the views publicly expressed by others, including the TCA.  These are not unusual activities.  To the contrary, it is a cornerstone of what scholars do.

The plaintiffs ask this Court to punish the defendants for the statements made by the CHGS and Prof. Chaouat, i.e., to punish the defendants because the CHGS and Prof. Chaouat expressed their views regarding the information set forth on the TCA website. Such punishment would violate the defendants' right to Academic Freedom.  If the

---

[23]  Regents of the University of California v. Bakke, 438 U.S. 265, 311 (1978).

[24]  Id., citing Sweezy v. New Hampshire, 354 U.S. 234, 263 (1857) (Frankfurter, J., concurring).

[25]  See Keyishian v. Boarf of Regents of the University of the State of New York, 385 U.S. 589, 603 (1967); Sweezy v. State of New Hampshire, 354 U.S. 234, 250 (1957).

plaintiffs disagree with the views expressed by the CHGS and Prof. Chaouat, their recourse is to continue to exercise their own free speech rights, and express their disagreement. As discussed further below, they remain free to do so.[26] Their recourse is not with this Court. The plaintiffs' claims should be dismissed.

### B.      Plaintiffs cannot state a First Amendment claim.

On its face, the Complaint fails to establish a violation of the plaintiffs' right to free speech. "The First Amendment generally prevents government from proscribing speech, (citation omitted) or even expressive conduct, (citation omitted) because of disapproval of the ideas expressed."[27] In this case, the defendants have not proscribed or otherwise limited the plaintiffs' ability to engage in free speech.

There is no allegation in the Complaint that the defendants blocked access to the TCA website (and in fact the defendants have not done so), or otherwise prevented or restricted the plaintiffs' ability to engage in free speech activities.  At all times, the plaintiffs remained free to express their views, on the TCA website and otherwise; and in

---

[26]   The plaintiffs have in fact continued to express their disagreement, in comments recently reported by the local media (See *Turkish group claims U of Minn. 'blacklisted' site*, Minneapolis Star Tribune, Dec. 1, 2010; *University of Minnesota Suit filed over academic dispute Plaintiffs objected to online information*, St. Paul Pioneer Press, Dec. 2, 2010; *U drops warning about 'unreliable' websites*, St. Paul Pioneer Press, Nov. 20, 2010; *Turkish group sues U for 'unreliable' website list*, The Minnesota Daily, Dec. 1, 2010; *Lawsuit brewing over U website warnings*, The Minnesota Daily, Nov. 23, 2010) and in a recent editorial published by The Minnesota Daily (*Turkish lobby:  We were blacklisted*, The Minnesota Daily, Dec. 7, 2010).

[27]   R.A.V. v. City of St. Paul, Minnesota, 505 U.S. 377, 382 (1992).

fact have continued to publicly express their views.[28]  At all times, University students, professors, and the public at large remained free to access those view, on the TCA website and otherwise.

At most, the Complaint alleges that the CHGS and Prof. Chaouat expressed their views regarding the validity of the information set forth on the TCA website, and whether the information should be used as the basis for scholarly research.  As discussed above, the CHGS and Prof. Chaouat had the right to do so.  The CHGS's and Prof. Chaouat's critique of the information set forth on the TCA website in no way prevented or restricted the plaintiffs' ability to express those views.  The plaintiffs' Complaint does not support a free speech claim.  The claim should be dismissed.

### C.     Plaintiffs cannot state a Due Process claim.

On its face, the Complaint fails to establish a violation of the plaintiffs' due process rights.  Due process requirements apply to the deprivation of constitutionally protected property or liberty interests.[29]  Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."[30]  "To have a property interest ... a person clearly must have more than an abstract need or desire for it.  He must have more

---

[28] See footnote 26.
[29] Board of Regents of State Colleges v. Roth, 408 U.S. 564, 569 (1972).

[30] Id. at 577.

than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it."[31] Liberty interest,

> ...denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized ... as essential to the orderly pursuit of happiness by free men.[32]

In this case, the plaintiffs cannot establish a deprivation of any constitutionally protected property or liberty interest. The Complaint does not identify any property interest that was allegedly deprived. With regard to liberty interest, the Complaint alleges that TCA was deprived of "its liberty of the opportunity to expose Defendants' students and professors to the contra-genocide viewpoint..."[33] Defendants are unaware of any such constitutionally protected right.

Even if such a right existed, there is no indication the plaintiffs were deprived of the right. As discussed above, the defendants did not block access to the TCA website. At most, CHGS and Prof. Chaouat expressed their views regarding the validity of the information set forth on the TCA website, and whether the information should be used as the basis for scholarly research. At all times, the plaintiffs remained free to express their views, on the TCA website and otherwise; and in fact have continued to publicly express their views. University students, professors, and the public at large remained free to

---

[31] Id.

[32] Id. at 572, quoting Meyer v. Nebraska, 262 U.S. 390, 399 (1923).

[33] Complaint ¶ 99.

access those views, on the TCA website and otherwise.  The plaintiffs' Complaint does
not support a due process claim.  The claim should be dismissed.

### D.    Plaintiffs cannot state an Equal Protection claim.

On its face, the Complaint fails to establish a violation of the plaintiff's equal
protection rights.   Pursuant to the Fourteenth Amendment to the United States
Constitution, "No State shall … deny to any person within its jurisdiction the equal
protection of the laws."[34]  "The Equal Protection Clause "prohibits government officials
from selectively applying the law in a discriminatory way."[35] It protects "fundamental
rights," "suspect classifications," and "arbitrary and irrational state action."[36]

In this case, the Complaint does not identify any law that the plaintiffs allege was
unequally applied.   At most, the Complaint alleges that CHGS and Prof. Chaouat
expressed their views regarding the validity of the information set forth on the TCA
website, and whether the information should be used as the basis for scholarly research.
As discussed above, the CHGS and Prof. Chaouat had the right to do so.

Academic critique, by its very nature, draws distinctions, sometimes based upon
the viewpoint expressed in the work/information under review.  However, the defendants
are not aware of any legal authority that would support the proposition that academic
critique by a public university or faculty member of publicly expressed views can serve

---

[34] U.S. Constitution, Amendment XIV, Section 1.

[35] Central Airlines, Inc. v. United States, 138 F.3d 333, 334-335 (8th Cir.1998) (citation
omitted).

[36] See Batra v. Board of Regents of University of Nebraska, 79 F.3d 717, 721 (8th Cir.
1996).

as the basis for an equal protection claim.  To rule otherwise would directly contradict the

principles of Academic Freedom.  The plaintiffs' Complaint does not support an equal

protection claim.  The claim should be dismissed.

E.      **Plaintiffs cannot state a defamation claim.**

On its face, the Complaint fails to establish a defamation claim.  The plaintiff in a

defamation action must specifically plead the alleged defamatory statements.[37]

Statements that lack sufficient precision, specificity, or verifiability cannot serve as the

basis for a defamation claim.[38]  Expressions of opinion, rhetoric, and figurative language

are generally not actionable.[39]

In this case, the alleged defamatory statements identified in the Complaint are the

Unreliable Websites Statement and the Chaouat Statement.   On their face, they are

statements of the CHGS's and Prof. Chaouat's opinions regarding the reliability of the

information set forth on the TCA website, and whether the information should be used as

the basis for scholarly research.

Further, the statements lacked the precision or specificity necessary to support a

defamation claim.  While the term "illegitimate" might be actionable if used to address a

person's paternity, the defendants' are not aware of any case where the term was found to

---

[37] See Stead-Bowers v. Langley, 636 N.W.2d 334, 342 (Minn. Ct. App. 2001); Thompto
v. Abbott-Northwestern Hospital, No. C4-93-213, 1993 WL 328780, at *2 (Minn. Ct.
App. 1993) (copy attached).

[38] See McGrath v. TCF Bank Sav., 502 N.W.2d 801, 808 (Minn. Ct. App. 1993).

[39] Bevo v. Delander, 632 N.W.2d 732, 739 (Minn. Ct. App. 2001)

support a claim of defamation when used to describe a source of information in the context of academic critique. The plaintiffs' Complaint does not support a defamation claim. The claim should be dismissed.

### F.     Plaintiffs lack standing.

On the face of the Complaint, the plaintiffs cannot establish that they have standing to proceed with their claims. "Standing is a 'threshold inquiry' and 'jurisdictional prerequisite' that must be resolved before reaching the merits of a suit."[40] "Standing is the constitutional requirement, imposed by the 'cases or controversies' provision of Article III, that a plaintiff must allege a judicially cognizable and redressable injury in order to pursue a lawsuit."[41] "The constitutional minimum of standing requires an 'injury in fact,' 'a causal connection between the injury and the conduct complained of,' and a likelihood 'the injury will be redressed by a favorable decision.'"[42]

In this case, the plaintiffs cannot establish that they have suffered any injury. There is no allegation that the defendants blocked access to the TCA website, and in fact the defendants did not do so. At all times, the plaintiffs remained free to express their views, through the TCA website and otherwise; and in fact have continued to publicly express their views. At all times, University students, professors, and the public at large have remained free to access the plaintiffs' views, through the TCA website and

---

[40] Medalie v. Bayer Corp., 510 F.3d 828, 829 (8th Cir.2007) (quoting City of Clarkson Valley v. Mineta, 495 F.3d 567, 569 (8th Cir.2007)).

[41] Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin County, 115 F.3d 1372, 1378 (8th Cir.1997) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-60 (1992)).

[42] Medalie, 510 F.3d at 829 (quoting Lujan, 504 U.S. at 560-61).

otherwise. The Complaint acknowledges that the unreliable websites list has been removed from the CHGS website, and that the University has no plans to restore the list at any point in the future.

The plaintiffs' Complaint alleges that, because of the CHGS's and Prof. Chaouat's statements, unidentified third persons were discouraged from considering TCA's viewpoint, and that the influence of TCA's viewpoint was blunted in the marketplace of ideas. Even if this is true, it does not establish a judicially cognizable or redressable injury. The TCA's publicly expressed views, like the publicly expressed views of any other person or entity, are subject to comment and critique, by public universities, members of their faculties, and others. The plaintiffs have the right to express their views. However, they do not have the right to do so free from public critique and comment. The plaintiffs lack standing. Their claims should be dismissed.

### G.    The claims against defendants Bruininks and Chaouat are barred by qualified immunity.

Finally, the plaintiffs' claims against President Bruininks and Prof. Chaouat in their individual capacities are barred by the doctrine of qualified immunity. Qualified immunity is meant to give government officials a right not merely to avoid standing trial, but also to avoid the burdens of "such pretrial matters as discovery," as "'[i]nquiries of

this kind can be peculiarly disruptive of effective government.'"[43]  As such, the issue of

qualified immunity is appropriately decided on a motion to dismiss.[44]

Qualified or "good faith" immunity protects public officials from personal liability

on constitutional claims when the officials acted in an objectively reasonable fashion.[45]

The qualified immunity doctrine provides government officials with an affirmative

defense to damages claims "insofar as their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known."[46]  The

reasonableness of an official's conduct is viewed in light of the legal rights that were

"clearly established" at the time the action was taken.[47]  For a right to be "clearly

established," "[t]he contours of the right must be sufficiently clear that a reasonable

official would understand that what he is doing violates that right."[48]  The United States

---

[43] Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (quoting from Harlow v. Fitzgerald, 457 U.S. 800, 817 (1982)).

[44] See, e.g., Dornheim v. Sholes, 430 F.3d 919, 926 (8th Cir. 2005) (affirming dismissal for failure to state a claim in civil rights suit); Bradford v. Huckabee, 394 F.3d 1012, 1015 (8th Cir. 2005) (reversing denial of motion to dismiss based on qualified immunity).

[45] Elwood v. Cty. of Rice, 423 N.W.2d 671, 674 (Minn. 1988) (citing Harlow v. Fitzgerald, 457 U.S. 800, 815 (1982)).

[46] Harlow, 457 U.S. at 818.

[47] Anderson v. Creighton, 483 U.S. 635, 639 (1987) (quoting Harlow, 457 U.S. at 818-19).

[48] Anderson, 483 U.S. at 640.

Supreme Court has interpreted qualified immunity as "protecting all but the plainly incompetent or those who knowingly violate the law."[49]

Thus, a two-part inquiry is required with respect to the plaintiffs' § 1983 claims against President Bruininks and Prof. Chaouat:  (1) whether the plaintiffs have alleged facts showing a violation of their constitutional rights, and (2) if so, whether "the right was clearly established such that a reasonable person would have known that his conduct violated the law."[50]

For all of the reasons discussed above, the plaintiffs' Complaint, on its face, fails to establish a violation of any of the plaintiffs' rights.  Even if they could state a claim, the plaintiffs cannot show their rights were clearly established.  At most, the Complaint alleges that the CHGS and Prof. Chaouat expressed their views regarding the validity of the information set forth on the TCA website, and whether the information should be used as the basis for scholarly research.  Given the principles of Academic Freedom, it was reasonable for President Bruininks and Prof. Chaouat to believe the CHGS and Prof. Chaouat had the right to express their views.  The plaintiffs' claims against President Bruininks and Prof. Chaouat are barred by the doctrine of qualified immunity.  The claims must be dismissed.

---

[49] Hunter v. Bryant, 502 U.S. 224, 227 (1991).

[50] See Monroe v. Ark. State Univ., 495 F.3d 591, 594 (8th Cir. 2007).

## V.  CONCLUSION

For the reasons set forth herein, the defendants respectfully request this Court to dismiss the plaintiffs' Complaint, in its entirety, with prejudice, and on the merits; to order the plaintiffs' to pay the costs and fees incurred by the defendants in responding to the Complaint; and to award the defendants such other relief as the Court deems just and reasonable.

DATE: December 17, 2010

MARK B. ROTENBERG
General Counsel
University of Minnesota

By: _____
Brent Benrud (#253194)
Associate General Counsel
360 McNamara Alumni Center
200 Oak Street SE
Minneapolis, MN 55455-2006
(612) 624-4100
benr0001@umn.edu

## CERTIFICATION

The undersigned certifies that this Memorandum of Law complies with the length requirements of Local Rule 7.1(d).  It was prepared using Microsoft Office Word 2003 (11.8328.8329) SP3.   The total word count, including headings, footnotes, and quotations, is 4,114.

_____
Brent Benrud