Case # 10-CV-4760 (DWF/FLN)

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

TURKISH COALITION OF AMERICA,
INC. and SINAN CINGILLI,

*Plaintiffs,*

v.

ROBERT BRUININK, BRUNO
CHAOUAT, and THE UNIVERSITY
OF MINNESOTA

*Defendants.*

---

BRUCE FEIN
*Pro Hac Vice*
1025 Connecticut Ave., NW, Ste 1000
Washington, D.C. 20036
Telephone: (703) 963-4968
Facsimile: (202) 478-1664
Email: bruce@thelichfieldgroup.com
Attorney for TALDF

DAVID SALTZMAN
*Pro Hac Vice*
655 15th Street, NW
Suite 225-F
Washington, DC 2005-5701
Office: (202) 637-9877
Mobile: (202) 637-9876
Email: dsaltzman@turklaw.net
Attorney for TALDF

LARRY FROST
Paladin Law, PLLC
5113 W 98th St #111
Bloomington, MN 55437
Telephone: (612) 839-5132
Email: larry.a.frost.atty@comcast.net
Local counsel for TALDF

# TABLE OF CONTENTS

INTRODUCTION ................................................................................. 1

STANADRDS FOR DEDCIDING A MOTION TO DIMISS FOR FAILURE TO STATE A CLAIM ....................................................................... 2

COUNTERSTATEMENT OF THE CASE ............................................ 3

ARGUMENT ..................................................................................... 11

A. PLAINTIFFS ADEQUATELY ALLEGE THAT DEFENDANTS' USE OF "DENIAL" AND "STRANGE MIXTURE OF FACT AND OPINION" DE FACTO PROHIBITED STUDENTS FROM VISITING OR USING TCA'S AND OTHER BLACKLISTED WEBSITES IN VIOLATION OF THE CLEARLY ESTABLISHED VOID-FOR-VAGUENESS DOCTRINE. ................................................ 11

B. PLAINTIFFS ADEQUATELY ALLEGE AN EQUAL PROTECTION VIOLATION OF THE FIRST AMENDMENT ................................................................................... 18

C. PLAINTIFFS ADEQUATELY ALLEGE THAT DEFENDANTS DEPRIVED THEM OF A CONSTITUTIONALLY PROTECTED LIBERTY INTEREST WITHOUT DUE PROCESS ................................................................................... 22

D. PLAINTIFFS ADEQUATELY ALLEGE A VIOLATION OF THE FIRST AMENDMENT PROHIBITON ON VIEWPOINT DISCRIMINATION ................................................................ 26

E. PLAINTIFFS ADEQUATELY ALLEGE VIOLATION OF THE FIRST AMENDMENT RIGHT TO RECEIVE INFORMATION ................................................................................... 32

F. PLAINTIFFS ADEQUATELY ALLEGE ACTIONABLE SCHOLASTIC FRAUD DEFAMATION IN COUNT VI ................................................................................... 36

G. PLAINTIFFS ADEQUATELY ALLEGE ACTIONABLE SCHOLASTIC FRAUD DEFAMATION IN COUNT VII ................................................................................... 38

H. STANDING AND QUALIFIED IMMUNITY ................................ 42

CONCLUSION .................................................................................. 42

## TABLE OF POINTS AND AUTHORITIES

<u>CASE</u>                                                    <u>PAGE NUMBER</u>

Ashcroft v. Iqbal, 556 U.S. ___ (2009)                        2, 3, 26, 33

Aulson v. Blanchard, 83 F. 3d 1 (1st Cir. 1996)                        3

Bantam Books v. Sullivan, 372 U.S. 58 (1963)          19, 21, 23, 26, 32

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2008)              2, 3, 33

Board of Education, Island Trees Union Free School
District No. 26 v. Pico, 457 US 853 (1982)                     15, 28, 33

Chicago v. Morales, 527 U.S. 41 (1999)                                14

Coates v. Cincinnati, 401 U.S. 611 (1971)                         14, 16

Collins v. Kentucky, 234 U.S. 634 (1914)                              13

Dixon v. Alabama State Board of Education,
294 F.2d 150 (5th Cir. 1961)                                          15

Esteban v. Central Missouri State College,
415 F.2d 1077 (8th Cir. 1969)                                         15

Good News Club v. Milford Century School, 533 U.S. 98 (2001)      18, 27

Goss v. Lopez, 419 U.S. 565 (1975)                                    14

Healy v. James, 408 U.S. 169 (1972)                           15, 29, 30

International Harvester Co. v. Kentucky, 234 U.S. 216, (1914)         12

Lamont v. Postmaster General, 381 U.S. 301 (1965)             33, 34, 35

Martin v. Struthers, 319 U.S. 141 (1943)                              33

New Jersey v. T.L.O., 469 U.S. 325 (1985)                             15

Paul v. Davis, 424 U.S. 693, 711 (1976)                               24

Powe v. Miles, 407 F.2d 73 (2d Cir. 1968)                             15

Putnam v. Keller, 332 F. 3d 541 (8th Cir. 2003)                                    25

Roberts v. U.S. Jaycees, 468 U.S. 609, 629 (1984)                                 13
Rosenberger v. Rector & Visitors of University
of Virginia, 515 U.S. 819, (1995)                                               19, 28

Safford Unified School District v. Redding, 557 U.S. __ (2009)                    15

Scheuer v. Rhodes, 416 U.S. 232 (1974)                                             2

Sweezy v. New Hampshire, 354 U.S. 234 (1957)                                       14

Terminiello v. Chicago, 337 U.S. 1 (1949)                                          32

Tinker v. Des Moines School District 393 U.S. 503 (1969)                          14

United States v. Schwimmer, 279 U.S. 644 (1929)                                    32

Wasson v. Trowbridge, 382 F.2d 807 (2d Cir. 1967)                                  15

Waters-Pierce Oil Co. v. Texas, 212 U.S. 86 (1909)                                12

West Virginia State Board of Education
v. Barnette, 319 U.S. 624 (1943)                                                26, 28

Widmar v. Vincent, 454 U.S. 263 (1981)                                             29

Wisconsin v. Constantineau, 400 U.S. 433 (1971)                                   24

Woodis v. Westark Community College,
160 F. 3d 435 (8th Cir. 1998)                                                     13

## OTHER AUTHORITY                                                    PAGE NUMBER

Kathleen M. Sullivan & Gerald Gunthur,
First Amendment Law 193 (1999)                                              18, 19, 27

Martin Shaw, The International Court of
Justice: Serbia, Bosnia, and genocide, February 28, 2007
(http://www.opendemocracy.net/globalization-
institutions_government/icj_bosnia_serbia_4392.jsp)                                5

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

TURKISH COALITION OF AMERICA,
INC. and SINAN CINGILLI,

**Plaintiffs,**

v.

ROBERT BRUININK, BRUNO
CHAOUAT, and THE UNIVERSITY
OF MINNESOTA

**Defendants.**

Case # 10-CV-4760 (DWF/FLN)

**PLAINTIFFS'
MEMORANDUM OF LAW IN
OPPOSITION TO
DEFENDANTS' MOTION TO
DISMISS**

## INTRODUCTION

Contrary to Defendants' expurgated version, the Complaint sufficiently alleges clearly established constitutional violations by Defendants in Counts I-V by, among other things, pleading a de facto prohibition on Plaintiff Cingilli and other University of Minnesota students by Defendants from visiting or using the Turkish Coalition of America's ("TCA") website. Complaint, paragraphs 4, 12, 87-90, 99, 101. The informal prohibition was accomplished by threatened academic retaliation for student disobedience to an express warning by Defendants. Ibid. Their motivation was hostility towards the educationally credible theory that Armenian deaths during World War I did not constitute genocide (hereinafter "the contra-genocide viewpoint"). Complaint, paragraphs 4, 12, 13, 15-18, 34-42, 73-78, 91-92, 97,

101, 109, 111.  Defendants' Motion to Dismiss Plaintiffs' constitutional claims collapses like a deck of cards with the recognition that the Complaint alleges Defendants de facto proscribed Cingilli and other student visitations or uses of TCA's website.

In addition, Defendants' opposition to defamation Counts VI and VII fails because their "scholastic fraud" demonization of TCA's website was actionable, not protected opinion according to the Supreme Court's decision in Milkovich v. Lorain Journal Co., 497 US 1 (1990).   Complaint, paragraphs 106, 110.

## STANADRDS FOR DEDCIDING A MOTION TO DIMISS FOR FAILURE TO STATE A CLAIM

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing the pleader is entitled to relief," in order to "give the defendant fair notice of what the claim is and the ground upon which it rests."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), 127 S.Ct. 1955, 1964 (2007).  A well-pleaded complaint should proceed even if it appears "that a recovery is very remote and unlikely."  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).  The Supreme Court further elaborated in Ashcroft v. Iqbal, 556 U.S. ___ (2009), 129 S.Ct. 1937 (2009): "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Ibid, at 1949.

In deciding a motion to dismiss for failure to state a claim, the court must accept as true "all well-pleaded factual averments and indulg[e] all reasonable inferences in the plaintiff's favor." Aulson v. Blanchard, 83 F. 3d 1, 3 (1st Cir. 1996). Defendants do not dispute these legal principles for deciding Rule 12(b)(6) motions for failure to state a claim. Indeed, Defendants neglect to discuss any standard of review whatsoever.

## COUNTERSTATEMENT OF THE CASE

Applying the standards of *Twombly, Iqbal*, and *Aulson,* the following narrative must be accepted as true.

Plaintiffs' Complaint recognizes that bona fide educational judgments should be made by educators. Complaint, paragraphs 13, 19, 29. The Complaint does *not* seek to have this Court sit as a virtual Minnesota State Board of Education to review professional educational judgments made by Defendants. Ibid. Neither is it asking this Court to sanction professors or universities for publishing their scholarly opinions of the reliability or value of various sources of information available to students or the public at large, including websites. Ibid.

Instead, the Complaint challenges a counter-educational decision, unique in the domain of colleges and universities, made by Defendants more than 150 years after the establishment of the Defendant University of Minnesota. Complaint, paragraphs 5, 13, 34-42, 73-78, 82-86, 91-92, 97, 101, 103, 105. The decision branded Plaintiff TCA's website and other allegedly "unreliable" websites with "scarlet letters" to "delegitimize" a particular idea: namely, that the deaths of Armenians by the Ottoman Empire during World War I amidst widespread mutual massacres did *not* constitute "genocide" as defined by the Genocide Convention. Complaint, paragraphs 6, 12, 15-18, 34-42, 73-78, 87-92.  As enumerated in the Complaint, renowned Middle East scholar Bernard Lewis of Princeton University and many other reputable experts support the contra-genocide viewpoint. Complaint, paragraph 4.

Defendants justified their disparagement of TCA's website by alleging that it fell into one of two unintelligible categories: a "strange mixture of fact and opinion," and "denial." Complaint, paragraphs 8-11, 73-78, 95. The twin categories are devoid of any non-subjective meaning. Complaint, paragraphs 8-11, 73-78, 95. Defendants never identified which purportedly justified their "scarlet letter" branding of TCA's website, in part because *none bothered to read it or its reference materials from beginning to end.*  Complaint, paragraphs 8-11, 25, 26, 95, 97.

Defendants' "denial" and "strange mixture of fact and opinion" criteria could be applied to virtually any website that the compiler of the list found

distasteful, including the online version of *The New York Times*. Complaint, paragraphs 8-11, 73-78, 95, 97.

The term "denial" could refer to denying the geocentric theory of the universe. Even when read in context as referring to genocide alone, the term is wildly subjective. Does it reach denial of an alleged genocide irrespective of the evidence of guilt? Bosnia & Herzegovina charged Serbia & Montenegro with the crime of genocide in connection with the killings of Bosnian civilians during the 1992-1995 Balkan War. But the International Court of Justice in 2006, while affirming that the Srebrenica massacre was properly characterized as genocide, ruled that Belgrade's actions were not. The ruling outraged Bosnians worldwide, prompting shouts of genocide denial. *See, e.g.,* Martin Shaw, *The International Court of Justice: Serbia, Bosnia, and genocide,* February 28, 2007 (http://www.opendemocracy.net/globalization-institutions_government/icj_bosnia_serbia_4392.jsp). Yet Defendants did not blacklist the International Court of Justice's website for engaging in "denial," demonstrating the wholly subjective nature of the term. Complaint, paragraph 9.

Azerbaijan has accused Armenia of genocide in connection with massacres of ethnic Azeris in the Nagorno-Karabakh region. *See, e.g., www.khojaly.net, www.khojaly.org.* Yet, aside from blacklisting a website that favors Azeri control of the region, the CHGS website was silent on the Azeri genocide accusation. Defendants' refusal to accept the possibility that

Armenians may have committed genocide against Azerbaijanis is tantamount to denial, yet Defendants refrained from listing the CHGS website as "unreliable" because engaged in "denial," another example of the word's subjectivity. Complaint, paragraphs 10, 77.

The "strange mixture of fact and opinion" was even more subjective than "denial." Many would describe major newspapers, for example, *The New York Times* or *The Wall Street Journal,* as earmarked by a "strange mixture of fact and opinion."   Complaint, paragraph 11. Others have probably assailed decisions of the United States Supreme Court or of this Court as a "strange mixture of fact and opinion." Yet the websites of these newspapers or courts were never listed.  In the world of education, the phrase "strange mixture of fact and opinion" is devoid of meaning. Virtually every serious sentence uttered contains both fact and opinion. Whether the mixture is "strange" is entirely in the eye of the reader or the ear of the listener. Ibid.

Defendants did not stop with stigmatizing TCA's website as unreliable through monumentally vague listing standards.  Through the CHGS website, Defendants also warned University of Minnesota students against visiting or using TCA's website on pain of academic penalties or reprisals.  Complaint, paragraph 4, 12, 87-90.  Defendant Bruno Chaouat Director of the Center for Holocaust and Genocide Studies, suspended a sword of Damocles over Plaintiff Cingilli by refusing to give assurance that the University of Minnesota student would not suffer academically if he disobeyed the warning

and visited or used TCA's website—*even for the purpose of disputing the contra-genocide viewpoint.* Complaint, paragraph 89. Defendants' threat of academic retaliation placed a de facto prohibition on TCA's communicating its contra-genocide viewpoint to Cingilli and other students via its website; and, placed a de facto prohibition on Cingilli's and other students' receipt of the contra-genocide viewpoint on TCA's website. Complaint, paragraphs 12, 87-90, 99, 101.

Defendants provided *no* elements of due process to Plaintiff TCA or other owners whose websites were de facto prohibited from visitation or use by Plaintiff Cingilli and other University of Minnesota students: no notice, no opportunity to be heard, no right to appeal, no right to periodic review of the listing, no right to an identified and impartial decision-maker, and, no intelligible standards for blacklisting. Complaint, paragraphs 8-11, 14, 78, 95, 98.

According to the Complaint, students and professors eschewed visiting or using TCA's website due to fear of retaliation by Defendants. Complaint, paragraphs 12, 87-90, 99, 101. That allegation is more than plausible. It is a virtual certainty. Callow students preoccupied with grades and generally in awe of professors are unlikely to defy a university's warning specifically addressed to them against visiting or using a blacklisted website purportedly for unreliability. And plausible factual assertions may not be contested in a motion to dismiss for failure to state a claim.

Defendants' unreliable website listing, warning, and threatened retaliation stunted critical thinking by Cingilli and other University of Minnesota students. Complaint, paragraphs 5, 13, 24, 82-86. It prohibited their exposure to the contra-genocide viewpoint; and, it compromised their ability independently to evaluate its persuasiveness. Complaint, paragraphs 5, 12, 13, 87-92, 99, 101.

Defendants never articulated an educational reason for their de facto ban on student visitations or use of TCA's website because there was none. Complaint, paragraph 84. Indeed, Defendants' actions contradicted the mission statement of Defendant University of Minnesota and the academic freedom promised on its campuses. Complaint, paragraphs 80, 84.

Defendants juxtaposed and likened TCA's website to scholastically fraudulent racist websites that deny the Holocaust in an attempt to "delegitimize" the educationally credible contra-genocide viewpoint. Complaint, paragraphs 6, 12, 73-78, 91-92, 95, 97, 104-111. Defendants bypassed for listing under the "denial" standard websites that disputed other claimed or proven genocides, for example, Rwanda, Srebrenica, Cambodia, Darfur, Azerbaijan, Ukraine, or the Belgian Congo. Complaint, paragraphs 12, 73. Defendants' conspicuous selectivity in their "unreliable" websites blacklist confirms that its sole counter-educational purpose was to de facto prohibit Plaintiff Cingilli and other students' exposure to the contra-genocide viewpoint because of hostility to that particular idea, and not to cast a cloud

8

over every viewpoint that quarreled with a claimed genocide. Complaint, paragraphs 12, 73-78, 97, 99, 103, 105.

Maintenance of the website blacklist was amateurish at best. Several listed links were broken or no longer existed. Complaint, paragraphs 56, 63, 66, 68. If the list had been promulgated with an authentic educational purpose, greater professionalism would have been shown in the monitoring and updating of the stigmatized websites.

Approximately four years after the unreliable website creation in 2006, on or about November 18, 2010, Defendants received a draft complaint from Plaintiffs seeking, among other things, injunctive relief against their blacklisting of TCA's website as "unreliable," and thus prohibiting student visitations or use. Defendants immediately terminated their counter-educational caper with no assertion or insinuation that their educational mission had been compromised in any way. Complaint, paragraph 15.

The person or persons responsible for compiling the "unreliable" website blacklist remain anonymous. That anonymity discredits Defendants' conclusory assertion that Plaintiffs' complaint concerns the right of professors to express their opinions about academic subjects. Complaint, paragraph 7. No professor is identified on the CHGS website or otherwise as responsible for tagging TCA's website or any other website with a "scarlet letter." Complaint, paragraph 78.

Defendants' stigmatizing listing of Plaintiff TCA's website as "unreliable" coupled with the student warning and threatened retaliation for disobedience conveyed a false and defamatory assertion: namely, that TCA's website defense of the contra-genocide viewpoint constituted "scholastic fraud." Complaint, paragraphs 14, 91-93, 105-107, 109-111. In Defendants' own words, the listing was a "scarlet letter" intended to "delegitimize" the contra-genocide viewpoint on TCA's website by, among other things, associating it and TCA with scholastically fraudulent and racist Holocaust denial by juxtaposition. Complaint, paragraphs 78, 89, 93, 95.

Defendants' violated Plaintiffs' several clearly established constitutional rights of which reasonable persons would have known: fair warning; equal protection under the First Amendment; due process before deprivation of a constitutionally protected liberty interest; freedom of speech; and, the right to receive information. Complaint, paragraphs 14, 95, 97, 99, 101, 103. Defendants also falsely defamed Plaintiff TCA by their "scarlet letter" branding of its website as "unreliable," and indistinguishable from scholastically fraudulent Holocaust denial. Complaint, paragraphs 6, 12, 14, 73-78, 91-93, 105-111. In context, Defendants implied knowledge of facts demonstrating Plaintiff TCA resorted to scholastic fraud in defending the contra-genocide viewpoint on its website. Ibid.

Defendants' misstatement of the case resembles a critique of *Hamlet* without even a cameo appearance for the Prince of Denmark:

"The plaintiffs ask this Court to punish the defendants for the statements made by the CHGS and Prof. Chaouat, i.e., to punish the defendants because the CHGS and Prof. Chaouat expressed their views regarding the information set forth on the TCA website. Such punishment would violate the defendants' right to Academic Freedom." Memorandum of Law in Support of Defendants' Motion to Dismiss, pages 7-8.

Defendants shut their eyes to the Complaint's marquee allegations that they de facto prohibited Plaintiff Cingilli and other University of Minnesota students from visiting or using Plaintiff TCA's website because of hostility towards its educationally credible contra-genocide viewpoint. Complaint, paragraphs 5, 12, 13, 87-92, 99, 101.

## ARGUMENT

**A. PLAINTIFFS ADEQUATELY ALLEGE THAT DEFENDANTS' USE OF "DENIAL" AND "STRANGE MIXTURE OF FACT AND OPINION" DE FACTO PROHIBITED STUDENTS FROM VISITING OR USING TCA'S AND OTHER BLACKLISTED WEBSITES IN VIOLATION OF THE CLEARLY ESTABLISHED VOID-FOR-VAGUENESS DOCTRINE**

Count I of the Complaint seeks damages for Plaintiff TCA under 42 U.S.C. 1983. Complaint, paragraph 1. It alleges Defendants stigmatized its website as "unreliable" because it purportedly represented "denial" or a "strange mixture of fact and opinion." Complaint, paragraph 4. In addition, Defendants de facto prohibited students from visiting or using TCA's website. Complaint, paragraphs 5, 12, 13, 87-90, 99, 101. In combination, the listing and de facto prohibition violated Plaintiff TCA's clearly established due

11

process protection against unconstitutionally vague school administrative standards employed to sanction or burden free speech. Complaint, paragraphs 94, 95. A reasonable person would have known Defendants' actions violated clearly established constitutional law. Complaint, paragraphs 88-95.

Defendants duck Count I entirely. They make no attempt to dispute that the CHGS' criteria for blacklisting TCA's website —"denial," or "strange mixture of fact or opinion"— are unintelligible, wholly subjective, and, devoid of objective meaning. This Court must also accept as true, as alleged in the Complaint, that Defendants' marking TCA's website with a "scarlet letter" and threatening students with academic penalties for visiting or using it constituted a de facto student prohibition. Complaint, paragraphs 5, 12, 13, 87-90, 99, 101.

The case law clearly establishes that Defendants' employment of "denial" and "strange mixture of fact and opinion" as listing and prohibition standards against TCA's website in a collegiate-administrative setting violated the void-for-vagueness doctrine. It took root more than a century ago.

The Supreme Court initially concluded that definitional vagueness could be a constitutional vice in Waters-Pierce Oil Co. v. Texas, 212 U.S. 86, 108 (1909). From the earliest cases holding that a statute was unconstitutionally vague, (see International Harvester Co. v. Kentucky, 234

U.S. 216, (1914), and Collins v. Kentucky, 234 U.S. 634 (1914)), to the present, the Supreme Court has explained that the void-for-vagueness doctrine guarantees fair notice to the citizenry of what conduct or speech might trigger government sanctions; and, prevents arbitrary or capricious enforcement or application.  The Supreme Court summarized in Roberts v. U.S. Jaycees, 468 U.S. 609, 629 (1984):

> "The void-for-vagueness doctrine reflects the principle that 'a statute which either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.' Connally v. General Construction Co., 269 U.S. 385, 391 (1926). The requirement that government articulate its aims with a reasonable degree of clarity ensures that state power will be exercised only on behalf of policies reflecting an authoritative choice among competing social values, reduces the danger of caprice and discrimination in the administration of the laws, enables individuals to conform their conduct to the requirements of law, and permits meaningful judicial review. See, e. g., Kolender v. Lawson, 461 U.S. 352, 357-358 (1983); Grayned v. City of Rockford, 408 U.S. 104, 108-109 (1972); Giaccio v. Pennsylvania, 382 U.S. 399, 402-404 (1966)."

Where, as alleged in Count I of the Complaint, the government de facto prohibits free speech or the receipt of information protected by the First Amendment, a higher degree of specificity is required to satisfy the void-for-vagueness doctrine than is the case for non-speech restrictions.  See Woodis v. Westark Community College, 160 F. 3d 435 (8th Cir. 1998).

In Keyishian v. Board of Regents, 385 U.S. 589 (1967), for instance, the Court held unconstitutionally vague the terms "treasonable or seditious" utterances or acts as justifications for terminating university employment.

The word "loitering" was held unconstitutionally vague in Chicago v. Morales, 527 U.S. 41 (1999).   And the Court struck down an ordinance prohibiting "annoying" behavior in Coates v. Cincinnati, 401 U.S. 611, 614 (1971), explaining:

> "We are thus relegated, at best, to the words of the ordinance itself. If three or more people meet together on a sidewalk or street corner, they must conduct themselves so as not to annoy any police officer or other person who should happen to pass by. In our opinion, this ordinance is unconstitutionally vague because it subjects the exercise of the right of assembly to an unascertainable standard, and unconstitutionally broad because it authorizes the punishment of constitutionally protected conduct.
>     Conduct that annoys some people does not annoy others. Thus, the ordinance is vague not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all."

The terms "treasonable or seditious," "loitering," and "annoy" are markedly more specific that the terms "denial" and "strange mixture of fact or opinion challenged as unconstitutionally vague in Count I of Plaintiffs' Complaint.

It has long been established that the void-for-vagueness and sister constitutional prohibitions do not lapse on public school campuses. In Sweezy v. New Hampshire, 354 U.S. 234 (1957), the Court applied the due process clause to protect a state university professor from unauthorized interrogations into speech or associations by the State Attorney General.   In Tinker v. Des Moines School District, 393 U.S. 503 (1969), the First Amendment was held to protect non-disruptive student speech in public schools.  See also Goss v. Lopez, 419 U.S. 565 (1975) (due process applied to

14

school discipline); New Jersey v. T.L.O., 469 U.S. 325 (1985) (Fourth Amendment applied to searches by school authorities); Safford Unified School District v. Redding, 557 U.S. ___ (2009) (Fourth Amendment applied to prohibit student strip search); Island Trees Union Free School District No. 26 v. Pico, 457 US 853 (1982)(First Amendment held to prohibit removals of public school library books based on viewpoint); Healy v. James, 408 U.S. 169 (1972)(First Amendment applied to prevent a college from denying facilities to an organization because its views or philosophy were thought abhorrent). In sum, the Supreme Court has clearly established that due process (which includes the void-for-vagueness doctrine), freedom of speech, and the Fourth Amendment apply in public school or university settings, which reasonable persons should know.

The void-for-vagueness principle has been applied for at least 40 years by the United States Court of Appeals for the Eight Circuit to the standards employed by state colleges or universities to impose administrative sanctions. The Court of Appeals has endorsed a "reasonableness" principle to inform application of procedural guarantees required by the due process clause of the Fourteenth Amendment:  "We apply the standard of reasonableness in determining whether or not a student has been deprived of his constitutional rights." Esteban v. Central Missouri State College, 415 F.2d 1077, 1090 (8th Cir. 1969). See also Powe v. Miles, 407 F.2d 73, 84-85 (2d Cir. 1968); Wasson v. Trowbridge, 382 F.2d 807, 811-812 (2d Cir. 1967); Dixon v. Alabama State

Board of Education, 294 F.2d 150, 158-159 (5th Cir. 1961). The Eighth Circuit has indicated that due process before imposition of administrative sanctions must be afforded a college student "by way of adequate notice, definite charge, and a hearing with opportunity to present one's own side of the case and with all necessary protective measures." Esteban, supra, 415 F.2d at 1089. Nothing in the Eighth Circuit opinions suggest these constitutional due process guarantees for students should be denied, mutatis mutandis, to non-university speakers like TCA seeking to communicate with a university's student body.

The term "denial," in the context of Defendants' stigmatizing TCA's and other websites as "unreliable," is flagrantly unconstitutionally vague. To borrow from Coates, it is no standard at all. As Plaintiffs' elaborated in their Complaint, the term could refer to denying the geocentric theory of the universe. Even when read in context as referring to genocide alone, the term is completely subjective.

Defendants do not even hint at any objective standard that would constrain them against an arbitrary application of "denial" in blacklisting websites and de facto prohibiting students from visiting or using them. The term's monumental ambiguity violated the twin vices that inform the void-for-vagueness doctrine:  fair warning as to what speech risks a government sanction; and, safeguards against whimsical, discriminatory, or arbitrary applications.

The phrase "strange mixture of fact and opinion" is even more subjective than "denial." Every serious sentence or paragraph ever written or spoken includes both fact and opinion, including in major newspapers or judicial decisions. Whether the mixture is "strange" is quintessentially subjective. The undersigned believe Defendants' Memorandum in Support of the Motion to Dismiss contains a "strange mixture of fact and opinion." Defendants probably believe the same of Plaintiffs' Memorandum in Opposition. In the world of education, the phrase "strange mixture of fact and opinion" commands no specialized or delimiting meaning. Plaintiff has been unable to discover use of the phrase on any ostensible educational website other than Defendants'. Such ambiguity precludes fair warning to website owners as to what will be de facto prohibited to students; and, invites discriminatory, capricious, and arbitrary listing decisions based on the idiosyncratic fancies of the decider.

Accordingly, Count I alleges a viable constitutional damage claim by Plaintiff TCA based on the void-for-vagueness doctrine pivoting on Defendants' use of "denial" and "strange mixture of fact and opinion" as standards for de facto prohibiting students from visiting or using TCA's website, including exposure to its contra-genocide viewpoint. Defendants' employment of the vague terms, in context, violated the clearly established constitutional right of Plaintiff TCA of which a reasonable person—especially in a university setting—would have known. Count I should not be dismissed.

### B.   PLAINTIFFS ADEQUATELY ALLEGE AN EQUAL PROTECTION VIOLATION OF THE FIRST AMENDMENT

Count II of the Complaint alleges that Defendants branded TCA's website with a "scarlet letter" and de facto prohibited students from visiting or using it solely because of hostility towards the contra-genocide viewpoint. Complaint, paragraphs 96, 97. The Complaint alleged that other websites that dispute claimed genocides were not listed; and, that singling out the contra-genocide viewpoint for "scarlet letter" stigmatization and student prohibition violated the clearly established equal protection component of the First Amendment of which a reasonable person would have known. Supra.

Defendants wrongly maintain that the Complaint does not allege Defendants de facto prohibited Plaintiff Cingilli and other University of Minnesota students from visiting or using Plaintiff TCA's website. Memorandum of Law in Support of Defendants' Motion to Dismiss, page 8. The Complaint unambiguously does make that allegation. Complaint, paragraphs 4, 12, 87-90, 96, 97. The case law clearly establishes Plaintiffs' equal protection claim.

Viewpoint discrimination of the type practiced by Defendants against TCA is a per se violation of the First Amendment. See e.g., Good News Club v. Milford Century School, 533 U.S. 98, 106 (2001); KATHLEEN M. SULLIVAN & GERALD GUNTHUR, FIRST AMENDMENT LAW 193

(1999). The Court underscored in Rosenberger v. Rector & Visitors of University of Virginia, 515 U.S. 819, 828 (1995): "It is axiomatic that government may not regulate speech based on its substantive content or the message it conveys."

Count II clearly alleges that TCA's website was marked with a "scarlet letter" and students de facto prohibited from visiting or using it based solely because of the contra-genocide message it conveyed. Complaint, paragraphs 4, 12, 34-42, 73-78, 87-90, 96, 97. Defendants permitted the vast majority of websites unfettered access to University of Minnesota students. Count II allegations make out a classic case of a First Amendment violation.

Defendants' de facto student prohibition against use or visitation of TCA's website speech was effectuated in a manner indistinguishable from the "informal censorship" condemned by the Supreme Court in Bantam Books v. Sullivan, 372 U.S. 58 (1963). There, the Rhode Island legislature created the "Rhode Island Commission to Encourage Morality in Youth." The Commission was tasked to educate the public concerning materials containing obscene, indecent, or impure language or manifestly tending to the corruption of youth. It was further instructed to investigate and recommend prosecution to the State Attorney General of suspected violations of Rhode Island's anti-obscenity statutes.

Publishers of paperback books brought suit challenging the constitutionality of the Commission under the First and Fourteenth

Amendments. Plaintiffs' exclusive wholesale distributor was Max Silverstein & Sons. The Commission's practice was to notify a distributor on official stationary that certain designated books distributed by him had been reviewed and declared objectionable for sale to youths. The notice would customarily remind Silverstein of the Commission's duty to recommend to the Attorney General prosecution of purveyors of obscenity; and, that copies of the Commission's list of taboo books had been circulated to local police departments. After receiving a Commission notice, Silverstein's practice was to refuse to fill pending orders for listed publications, refuse new orders, and, retrieve and return unsold copies from his retailers. Silverstein boycotted the books tagged as objectionable by the Commission to avoid the possibility of court action against him or his retailers.

The Supreme Court condemned Rhode Island's informal scheme of censorship as contrary to the First Amendment and procedural due process rights of book publishers. It explained that form must yield to substance when freedom of speech is at stake:

> "It is true that appellants books have not been seized or banned by the State, and that no one has been prosecuted for their possession or sale. But though the Commission is limited to informal sanctions -- the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation -- the record amply demonstrates that the Commission deliberately set about to achieve the suppression of publications deemed "objectionable," and succeeded in its aim. We are not the first court to look through forms to the substance and recognize that informal censorship may sufficiently inhibit the circulation of publications to warrant injunctive relief.

It is not as if this were not regulation by the State of Rhode Island. The acts and practices of the members and Executive Secretary of the Commission disclosed on this record were performed under color of state law, and so constituted acts of the State within the meaning of the Fourteenth Amendment. Ex parte Young, 209 U. S. 123. Cf. Terry v. Adams, 345 U. S. 461. These acts and practices directly and designedly stopped the circulation of publications in many parts of Rhode Island. It is true, as noted by the Supreme Court of Rhode Island, that Silverstein was "free" to ignore the Commission's notices, in the sense that his refusal to "cooperate" would have violated no law. But it was found as a fact – and the finding, being amply supported by the record, binds us – that Silverstein's compliance with the Commission's directives was not voluntary. People do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around, and Silverstein's reaction, according to uncontroverted testimony, was no exception to this general rule. The Commission's notices, phrased virtually as orders, reasonably understood to be such by the distributor, invariably followed up by police visitations, in fact stopped the circulation of the listed publications ex proprio vigore. It would be naive to credit the State's assertion that these blacklists are in the nature of mere legal advice when they plainly serve as instruments of regulation independent of the laws against obscenity." Ibid at 67-68.

Plaintiff TCA is like the booksellers in Bantam Books in seeking to distribute its constitutionally protected contra-genocide viewpoint to Defendants' students. Defendants are like the Rhode Island Commission to Encourage Morality in Youth. While they did not formally ban TCA's website from student visitation or use, Defendants accomplished the same by threatening academic retaliation against any student who disobeyed the warning on CHGS's website. Defendants singled out TCA's website for student prohibition and not other websites that disputed claimed genocides solely because of hostility towards TCA's contra-genocide viewpoint. A

clearer case of Defendants' violating clearly established First Amendment precedents of which a reasonable person would have known is difficult to imagine.

Defendants do not dispute any of Plaintiffs' equal protection reasoning. Instead, they pretend that Plaintiffs have not alleged that Defendants de facto prohibited students from visiting or using TCA's website and its contra-genocide viewpoint; and, that Defendants did so through intimidation or threats of retaliation every bit as effectively as the Rhode Island Commission in Bantam Books suppressed constitutionally protected books by frightening distributors away from specified publications at the risk of prosecution. Complaint, paragraphs 4, 12, 87-90.

Count II sufficiently alleges Defendants violated Plaintiff TCA's clearly established constitutional right against viewpoint discrimination in violation of the equal protection component of the First Amendment of which a reasonable person would have known. It should not be dismissed.

## C.   PLAINTIFFS ADEQUATELY ALLEGE THAT DEFENDANTS DEPRIVED THEM OF A CONSTITUTIONALLY PROTECTED LIBERTY INTEREST WITHOUT DUE PROCESS

Defendants do not dispute that Plaintiff TCA's educationally credible contra-genocide viewpoint is constitutionally protected speech. Yet, according to the Complaint, Defendants provided no procedural safeguards whatever against erroneous listings of TCA's and other websites as

"unreliable," which triggered a de facto prohibition against student visitations or use of them. Complaint, paragraphs 7-12, 73-78, 95. The result de facto blocked TCA's contra-genocide viewpoint from student access. Complaint, paragraphs 4, 12, 87-92, 99. But TCA was denied notice; an opportunity to respond or to appeal; an explanation for the listing; and, an impartial decision-maker. Complaint, paragraphs 7-13, 30-42, 73-78, 87-92. Defendants' listings of websites as "unreliable" were made anonymously and in complete secrecy. Complaint, paragraph 7.

These procedural deficiencies were far more egregious than those constitutionally voided in Bantam Books. The Rhode Island Commission's standards for listing books as objectionable were more precise than "denial" or "strange mixture of fact and opinion." The Commission's identity was known. It was not anonymous, in contrast to the person or persons who decided to list TCA's website as "unreliable." But the Court in Bantam Books still found the Rhode Island Commission's procedures for listing books as objectionable patently flawed:

> "There is no provision whatever for judicial superintendence before notices issue or even for judicial review of the Commission's determination of objectionableness. The publisher or distributor is not even entitled to notice and hearing before his publications are listed by the Commission as objectionable. Moreover, the Commission's statutory mandate is vague and uninformative, and the Commission has done nothing to make it more precise. Publications are listed as "objectionable" without further elucidation....
> "The procedures of the Commission are radically deficient. They fall far short of the constitutional requirements of governmental regulation of obscenity. We hold that the system

of informal censorship disclosed by this record violates the Fourteenth Amendment." Ibid at 71.

Defendants' stigmatizing TCA's website as "unreliable" and de facto prohibiting student visitation or use clearly deprived Plaintiff TCA of a constitutionally protected liberty interest in sharing its contra-genocide views with willing students like Plaintiff Cingilli. The deprivation was effectuated without a crumb of due process.

Wisconsin v. Constantineau, 400 U.S. 433 (1971) and its progeny fortify that conclusion. There, Wisconsin authorized designated government agents to prohibit others from the purchase or receipt of liquor upon a posted finding of 'excessive drinking" or the exhibition of specified traits, for example, exposing himself or his family "to want" or becoming "dangerous to the peace of the community." The Court held the listing process procedurally defective under the Fourteenth Amendment, explaining:

> "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential. "Posting" under the Wisconsin Act may to some be merely the mark of illness; to others it is a stigma, an official branding of a person. The label is a degrading one. Under the Wisconsin Act, a resident of Hartford is given no process at all. This appellee was not afforded a chance to defend herself. She may have been the victim of an official's caprice. Only when the whole proceedings leading to the pinning of an unsavory label on a person are aired can oppressive results be prevented." Ibid at 437.

In Paul v. Davis, 424 U.S. 693, 711 (1976), the Court clarified that procedural due process protections apply to government inflicted reputational

injury only when the plaintiff suffers both stigmatization plus the alteration or extinguishment of "a right or status previously recognized by state law."

In this case, Plaintiffs' Complaint alleged that TCA's good name, reputation, honor, and integrity was tarnished by Defendants because of what they were doing to it: namely, listing TCA's website as "unreliable" because of "denial" or a "strange mixture of fact and opinion," and, de facto prohibiting Plaintiff Cingilli and other University of Minnesota students from visiting or using it. Complaint, paragraphs 87-91, 104-111. Before its listing, TCA enjoyed the right under the First Amendment, (which is incorporated as state law under the Supremacy Clause of Article VI) to share information on its website with University of Minnesota students. But because of Defendants' defamatory listing, Plaintiff's First Amendment right was extinguished.

In sum, Plaintiff TCA's right to due process before Defendants' listed its website as "unreliable" and de facto prohibited student use of visitation was clearly established. Complaint, paragraphs 4, 12, 87-90. A reasonable person would have known of TCA's entitlement to due process. That is especially true of Defendants Bruinicks and Chaouat who have dedicated their lives to academia. See Putnam v. Keller, 332 F. 3d 541 (8th Cir. 2003)(finding a clearly established right to procedural due process if a government discharge from employment is accompanied by stigmatizing public statements).

Defendants argue that Plaintiff TCA holds no constitutional right to communicate its contra-genocide viewpoint or other information on its website to students or professors over the Internet free from government restraint or prohibition. Memorandum of Law In Support of Defendants' Motion to Dismiss, page 10. Defendants fail to cite a single court decision in the history of the United States to support such a ludicrous proposition. If the First Amendment means anything, it means that the government may not suppress constitutionally protected speech to impose orthodoxy. West Virginia State Board of Education v. Barnette, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion....").

Defendants also argue that they have not blocked student access to TCA's website. Memorandum Of Law in Support of Defendants' Motion to Dismiss, Pages 8, 9. But the Complaint alleges that Defendants, de facto, have accomplished the equivalent according to the Bantam Books precedent. Complaint, paragraphs 4, 12, 87-90. Plaintiffs are entitled to their day in court to prove their allegation of a de facto prohibition, which far surpass the "plausibility" threshold of Ashcroft on a motion to dismiss.

Count III should not be dismissed for failure to allege a due process violation.

26

## D.   PLAINTIFFS   ADEQUATELY   ALLEGE   A VIOLATION OF THE FIRST AMENDMENT PROHIBITON ON VIEWPOINT DISCRIMINATION

Count IV of the Complaint alleges Defendants violated Plaintiff TCA's First Amendment right to communicate constitutionally protected speech on TCA's website specifically because of hostility towards TCA's contra-genocide viewpoint. Complaint, paragraphs 100, 101. Defendant Chaouat characterized his blacklisting of the TCA website and de facto prohibition on student visitations or use as a "scarlet letter." Complaint, paragraph 89. The goal, according to the Director of CHGS, was to "delegitimize" TCA's website, in an attempt to excommunicate its contra-genocide viewpoint from the marketplace of ideas. Complaint, paragraphs 4, 12, 30-42, 73-78, 90-92, 100, 101.

The suppression of speech because of viewpoint is a per se violation of the First Amendment. See KATHLEEN M. SULLIVAN & GERALD GUNTHUR, FIRST AMENDMENT LAW 193 (1999), supra.

In Good News Club v. Milford Central School, supra, the Court held unconstitutional a public school's discrimination against teaching about character and moral development from a religious perspective to justify denying a private Christian organization after school use of its building. The Court explained that even in a limited public forum, the State may not discriminate against speech on the basis of viewpoint, and any speech restriction must be reasonable in light of the purpose served by the forum.

In Lamb's Chapel v. Center Moriches Union Free School District, 508 U.S. 384 (1993), the Court held that a school district's exclusion from an afterschool forum of a church that taught family values from a religious perspective was unconstitutional viewpoint discrimination.

In Rosenberger v. Rector and Visitors of Univ. of Virginia, supra, a student organization at the University of Virginia was denied funding for printing expenses because its publication, Wide Awake, offered a Christian viewpoint. The university's funding discrimination based on the religious editorial viewpoints of the student organization was held unconstitutional.

In Board of Education v. Pico, 457 U.S. 853 (1982), the Court concluded that the First Amendment prohibited the removal of books from public school libraries primarily motivated by government disagreement with the ideas or viewpoints they conveyed. Writing for a plurality, Justice William Brennan amplified:

> "Our Constitution does not permit the official suppression of ideas. Thus whether petitioners' removal of books from their school libraries denied respondents their First Amendment rights depends upon the motivation behind petitioners' actions. If petitioners intended by their removal decision to deny respondents access to ideas with which petitioners disagreed, and if this intent was the decisive factor in petitioners' decision, then petitioners have exercised their discretion in violation of the Constitution. To permit such intentions to control official actions would be to encourage the precise sort of officially prescribed orthodoxy unequivocally condemned in [West Virginia State Board of Education v.] Barnette." Ibid at 870, 871.

In Widmar v. Vincent, 454 U.S. 263 (1981), the Court concluded that a state university practiced unconstitutional content-based discrimination (similar to but more easily demonstrable than viewpoint discrimination) in denying use of its facilities to a registered student group intending to use them for religious worship and religious discussion.  Justice Lewis Powell, writing for the Court, explained:

> "With respect to persons entitled to be there, our cases leave no doubt that the First Amendment rights of speech and association extend to the campuses of state universities. Here, UMKC has discriminated against student groups and speakers based on their desire to use a generally open forum to engage in religious worship and discussion. These are forms of speech and association protected by the First Amendment.  In order to justify discriminatory exclusion from a public forum based on the religious content of a group's intended speech, the University must therefore satisfy the standard of review appropriate to content-based exclusions.  It must show that its regulation is necessary to serve a compelling state interest, and that it is narrowly drawn to achieve than end." Ibid at 268-270 [internal citations omitted].

In Healy v. James, 408 U.S. 169 (1972), the Court held that a state university could not deny official campus recognition (including the privilege of holding meetings and use of campus bulletin boards) to a local chapter of the SDS simply because of the "disagreement of the President with the group's philosophy..." Ibid at 187.  Speaking for the Court, Justice Powell amplified:  "At the outset, we note that state colleges and universities are not enclaves immune from the sweep of the First Amendment...  It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Ibid at 180.

And, where state-operated educational institutions are involved, this Court has long recognized "the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." Ibid at 507.

Yet the precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large. Quite to the contrary:

> "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." Shelton v. Tucker, 364 U. S. 479, 487 (1960). The college classroom, with its surrounding environs, is peculiarly the "marketplace of ideas,'" and we break no new constitutional ground in reaffirming this Nation's dedication to safeguarding academic freedom. Keyishian v. Board of Regents, 385 U. S. 589, 385 U. S. 603 (1967); Sweezy v. New Hampshire, 354 U. S. 234, 354 U. S. 249-250 (1957) (plurality opinion of Mr. Chief Justice Warren), 262 (Frankfurter, J., concurring in result)."

Justice Powell further explained in Healy that denial of campus recognition placed a severe practical burden on the student organization's First Amendment rights:

> There can be no doubt that denial of official recognition, without justification, to college organizations burdens or abridges that associational right. The primary impediment to free association flowing from nonrecognition is the denial of use of campus facilities for meetings and other appropriate purposes. The practical effect of nonrecognition was demonstrated in this case when, several days after the President's decision was announced, petitioners were not

30

allowed to hold a meeting in the campus coffee shop because they were not an approved group.

      Petitioners' associational interests also were circumscribed by the denial of the use of campus bulletin boards and the school newspaper. If an organization is to remain a viable entity in a campus community in which new students enter on a regular basis, it must possess the means of communicating with these students. Moreover, the organization's ability to participate in the intellectual give and take of campus debate, and to pursue its stated purposes, is limited by denial of access to the customary media for communicating with the administration, faculty members, and other students. Such impediments cannot be viewed as insubstantial."

In reversing and remanding for further proceedings, Justice Powell underscored that disagreement with a group's philosophy was not a constitutionally acceptable justification for denying campus recognition:

"The mere disagreement of the President with the group's philosophy affords no reason to deny it recognition. As repugnant as these views may have been, especially to one with President James' responsibility, the mere expression of them would not justify the denial of First Amendment rights. Whether petitioners did in fact advocate a philosophy of "destruction" thus becomes immaterial. The College, acting here as the instrumentality of the State, may not restrict speech or association simply because it finds the views expressed by any group to be abhorrent." Ibid at 187, 188.

Defendants have not disputed any of Plaintiff's First Amendment arguments. Instead, they erroneously deny that the Complaint alleges Defendants have de facto prohibited students from visiting or using TCA's website: "There is no allegation in the Complaint that the defendants blocked access to the TCA website (and in fact the defendants have not done so), or otherwise prevented or restricted the plaintiffs' ability to engage in free

speech activities." Memorandum of Law in Support of Defendants' Motion to Dismiss, page 8. But the Complaint expressly alleges that Defendants' threatened academic retaliation against Cingilli and other students for visiting or using the TCA website was a de facto prohibition because of the predictable student fear the threats engendered. Complaint, paragraphs 4, 12, 87-90. The fear factor alleged in Plaintiffs' Complaint is indistinguishable from the fear factor proven in Bantam Books to have caused book distributors to boycott books listed as objectionable by the Rhode Island Commission to avoid the risk of prosecution. Complaint, paragraph 88.

Defendants may be angered by the contra-genocide viewpoint. But the Supreme Court declared in Terminiello v. Chicago, 337 U.S. 1 (1949):

> "[A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea."

And Justice Oliver Wendell Holmes lectured in United States v. Schwimmer, 279 U.S. 644 (1929)(dissenting opinion): "If there is any principle of the Constitution that more imperatively calls for attachment than any other, it is the principle of free thought--not free thought for those who agree with us but freedom for the thought that we hate."

Count IV sufficiently alleges that Defendants violated Plaintiff TCA's clearly established constitutional right to free speech of which a reasonable

person would have known under the Twombly-Ashcroft standards of pleading. It should not be dismissed for failure to state a claim.

## E.   PLAINTIFFS   ADEQUATELY   ALLEGE   A VIOLATION OF THE FIRST AMENDMENT RIGHT TO RECEIVE INFORMATION

Count V alleges Defendants violated Plaintiff Cingilli's clearly established First Amendment right to receive information by their de facto prohibition on his visiting or using TCA's website because of hostility to the educationally credible contra-genocide viewpoint. Complaint, paragraphs 87-93, 103, 103.

The Supreme Court has recognized a First Amendment right to receive information free from government restraint or prohibition since at least Martin v. City of Struthers, 319 U.S. 141 (1943), decided more than 65 years ago. There, Justice Hugo Black elaborated:

> "The right of freedom of speech and press has broad scope. The authors of the First Amendment knew that novel and unconventional ideas might disturb the complacent, but they chose to encourage a freedom which they believed essential if vigorous enlightenment was ever to triumph over slothful ignorance. This freedom embraces the right to distribute literature, and necessarily protects the right to receive it." Ibid at 143.

A First Amendment right to receive information was acknowledged and upheld in Lamont v. Postmaster General, 381 U.S. 301 (1965) (right to receive "communist political propaganda"). The Court amplified on the reasons in Board of Education v. Pico, supra:

"[W]e have held that in a variety of contexts 'the Constitution protects the right to receive information and ideas.' Stanley v. Georgia, 394 U.S. 557, 564 (1969); see Kleindienst v. Mandel, 408 U.S. 753, 762 -763 (1972) (citing cases). This right is an inherent corollary of the rights of free speech and press that are explicitly guaranteed by the Constitution, in two senses. First, the right to receive ideas follows ineluctably from the sender's First Amendment right to send them: 'The right of freedom of speech and press . . . embraces the right to distribute literature, and necessarily protects the right to receive it.' Martin v. Struthers, 319 U.S. 141, 143 (1943) (citation omitted). 'The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers.' Lamont v. Postmaster General, 381 U.S. 301, 308 (1965).

More importantly, the right to receive ideas is a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom. Madison admonished us: 'A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both. Knowledge will forever govern ignorance: And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives." 9 Writings of James Madison 103 (G. Hunt ed. 1910). 20   [457 U.S. 853, 868]

As we recognized in Tinker, students too are beneficiaries of this principle: 'In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate. . . . [S]chool officials cannot suppress 'expressions of feeling with which they do not wish to contend.'" 393 U.S., at 511 (quoting Burnside v. Byars, 363 F.2d 744, 749 (CA5 1966)).'

In sum, just as access to ideas makes it possible for citizens generally to exercise their rights of free speech and press in a meaningful manner, such access prepares students for active and effective participation in the pluralistic, often contentious society in which they will soon be adult members. " Ibid at 866-868.

Even as regards commercial speech of less social value than political or

non-commercial expression, the Court has sustained a right to receive

information.   In Virginia State Pharmacy Board v. Virginia Citizens Consumer Council, 425 U.S. 748, 756-757 (1976), the Court upheld a right to receive prescription drug advertisements, and explained:

> "Freedom of speech presupposes a willing speaker. But where a speaker exists, as is the case here,  the protection afforded is to the communication, to its source and to its recipients both. This is clear from the decided cases. In Lamont v. Postmaster General, 381 U.S. 301 (1965), the Court upheld the First Amendment rights of citizens to receive political publications sent from abroad.  More recently, in Kleindienst v. Mandel, 408 U.S. 753, 762 -763 (1972), we acknowledged that this Court has referred to a First Amendment right to 'receive information and ideas,' and that freedom of speech `necessarily protects the right to receive.' And in Procunier v. Martinez, 416 U.S. 396, 408 -409 (1974), where censorship of prison inmates' mail was under examination, we thought it unnecessary to assess the First Amendment rights of the inmates themselves, for it was reasoned that such censorship equally infringed the rights of noninmates to whom the correspondence was addressed. There are numerous other expressions to the same effect in the Court's decisions. See, e. g., Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 390 (1969); Stanley v. Georgia, 394 U.S. 557, 564 (1969); Griswold v. Connecticut, 381 U.S. 479, 482 (1965); Marsh v. Alabama, 326 U.S. 501, 505 (1946); Thomas v. Collins, 323 U.S. 516, 534 (1945); Martin v. Struthers, 319 U.S. 141, 143 (1943). If there is a right to advertise, there is a reciprocal right to receive the advertising, and it may be asserted by these appellees."

Defendants do not dispute a First Amendment right to receive information by Plaintiff Cingilli. Instead, Defendants wrongly maintain that Plaintiffs' do not allege that Defendants de facto prohibited Cingilli and other students from visiting or using TCA's website because of hostility to the contra-genocide viewpoint.  But that is precisely what the Complaint alleges. Complaint, paragraphs 87-93.

Accordingly, Count V sufficiently alleges that Defendants violated Plaintiff Cingilli's clearly established First Amendment right to receive information of which a reasonable person would have known. It should not be dismissed for failure to state a claim.

## F. PLAINTIFFS ADEQUATELY ALLEGE ACTIONABLE SCHOLASTIC FRAUD DEFAMATION IN COUNT VI

Count VI of the Complaint alleges that Defendants defamed Plaintiff TCA by implying knowledge of facts that would demonstrate its website practiced "scholastic fraud" in defending the contra-genocide viewpoint. Complaint, paragraphs 6, 12, 73-78, 91-92, 95, 97, 104-107. Defendants asserted that TCA's website was "unreliable"; and, that the unreliability turned on "denial" or a "strange mixture of fact and opinion." Complaint, paragraph 4. Defendants also warned students against visitation or use of the TCA website, and juxtaposed it with racist and scholastically fraudulent Holocaust denial websites. Complaint, paragraphs 4, 6, 12, 43-78, 87-90, 104-107. This combination of actions and assertions, in context, implied Defendants had knowledge of facts that would prove TCA's website practiced "scholastic fraud, bigotry, or hatred towards Armenians, and callousness towards Armenian deaths in World War I..." in defending its contra-genocide viewpoint. Complaint, paragraph 106. As Defendant Chaouat acknowledged,

Defendants meant to stigmatize TCA's website with a "scarlet letter." Complaint, paragraphs 87-92.

Defendants errantly maintain that the allegedly defamatory assertion of "scholastic fraud" is protected "opinion." It is not. The assertion can be proven true or false.

The Supreme Court demarcated the line between constitutionally protected opinion and actionable assertions in Milkovich v. Lorain Journal Co., 497 U.S. `1 (1990). Chief Justice William H. Rehnquist refused to create a safe harbor for factual averments preceded by, "In my opinion." He elaborated:

> "If a speaker says, 'In my opinion John Jones is a liar,' he implies knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." Ibid at 18-20.

The Chief Justice thus concluded that an alleged assertion is actionable if it is "sufficiently factual to be susceptible of being proven true or false." Ibid at 21.

Defendants' imputation of "scholastic fraud" to Plaintiff TCA satisfies the Milkovich standard for actionable defamation. The accusation can be proven true or false. In the context of the Complaint, a reasonable person would interpret "scholastic fraud" to mean the intentional or reckless falsification of evidence by TCA on its website to support the contra-genocide

viewpoint. An example from a listed Holocaust denial website illustrates scholastic fraud.

Plaintiff TCA was blacklisted alongside an article published by Utah's Independent Media News Source (hereinafter "UIMNS") (available at http://utah.indymedia.org/news/2005/12/12654_comment.php). That website knowingly or recklessly adduces a series of falsities in support of its conclusion that the holocaust is overblown and relatively insignificant.

The link reveals a cartoon that includes the phrase. "No mass graves were ever found" in a box of purported "truth" concealed by Jewish propaganda. But Jewish mass graves at Babi Yar, Auschwitz, Dachau, and other extermination camps have been notoriously proven as facts as definitively as the force of gravity. The website's denial of the obvious is a demonstrably intentional or recklessly false assertion of fact.

In support of its scholastic fraud defamation claim, Plaintiff TCA is prepared to prove that its website is devoid of any falsification of facts to support the educationally credible contra-genocide viewpoint.

Defendants' imputation through its unreliable website listing, student warning, and juxtaposition with Holocaust denial websites that Plaintiff TCA's website contra-genocide viewpoint represents scholastic fraud implied Defendants' knowledge of underlying facts showing TCA intentionally or recklessly engaged in falsifying evidence to support its contra-genocide viewpoint. Those underlying facts are susceptible of being proven true or

false under Milkovich. Therefore, Defendants' imputation of scholastic fraud to TCA is actionable.

Count VI should not be dismissed for resting on constitutionally protected opinion.

### G. PLAINTIFFS ADEQUATELY ALLEGE ACTIONABLE SCHOLASTIC FRAUD DEFAMATION IN COUNT VII

Count VII alleges that Defendants defamed Plaintiff TCA by Defendant Chaouat's assertion that its website was an "illegitimate" source of information for students or "dubious," which, in context, imputed "scholastic fraud" to TCA, i.e., the intentional or reckless falsification of evidence presented on its website to support the contra-genocide viewpoint. Complaint, paragraphs 4, 6, 12, 34-78, 90-92, 104-111. For the reasons set forth regarding Count VI, the Defendants' assertion that TCA is engaging in "scholastic fraud" in justifying its contra-genocide viewpoint is not protected opinion, but actionable defamation under Milkovich. TCA's intentional or reckless falsification of evidence to support its contra-genocide viewpoint is susceptible of being proven true or false.

Contrary to Defendants' assertions, Defendants' alleged defamatory statements are specifically pled in the Complaint, including the Exhibit, i.e., the CHGS websites plus Defendant Chaouat's remarks, which, in context, imputed or implied "scholastic" fraud by TCA. Complaint, paragraph 104-

111. On the score of specificity, Plaintiff TCA's "scholastic fraud" defamation counts are indistinguishable from the defamation claim sustained in Milkovich. There, the Court found nine sentences in a newspaper article plus a headline had collectively and in context, directly or through connotation, accused the petitioner of the crime of perjury. Here, the CHGS website warning, unreliable website listing, and Chaouat's remarks referenced in the Complaint, in context, provide Defendants with fair notice of what Plaintiff TCA asserts is defamatory:   namely, the imputation of scholastic fraud, which implies Defendants' knowledge of underlying facts showing TCA intentionally or recklessly falsified evidence to support its contra-genocide view on its website.

The three Minnesota state cases cited by Defendants do not undermine that conclusion.

In Stead-Bowers v. Langley, 636 N.W. 2d 334 (2001), the Minnesota Court of Appeals, in affirming a denial of a motion to amend a complaint to state a claim of defamation, noted that Plaintiff had failed to plead the alleged defamatory statements.   In contrast, in this case Plaintiff TCA has plead every statement of Defendants which are said to impute to TCA's website scholastic fraud in justifying its contra-genocide viewpoint.

In McGrath v. TCF Savings Bank, 502 N.W. 2d 801 (1993), the Minnesota Court of Appeals affirmed a JNOV on a defamation count.   The judgment rested on allegations that Defendant had accused Plaintiff of being

a "troublemaker."   Applying the Milkovich test, the Court of Appeals concluded that making trouble was in the eye of the beholder, and, that whether Plaintiff was a "troublemaker" could not be proven true or false.  The Court of Appeals reasoned:

> "The term 'troublemaker' lacks precision and specificity.  This phrase also fails to suggest verifiable facts about [Plaintiff]. Finally, the ambiguity of the term "troublemaker" prevents any underlying facts from being inferred from this phrase."

This rebuke for ambiguity does not apply to Plaintiff's claim.  Plaintiff TCA in this case has alleged an obvious factual connotation of Defendants' statements in specific and factually demonstrable words; namely, that Plaintiff TCA has committed scholastic fraud, which implies knowledge of underlying facts showing that TCA intentionally or recklessly falsified evidence to support its contra-genocide viewpoint.   Complaint, paragraphs 104-111.

In Bebo v. Delander, 632 N.W. 2d 732 (2001), the Minnesota Court of Appeals concluded that certain vulgarities were not actionable defamatory statements.  It explained:

> "The statements are not precise, specific, verifiable, and they were made in the context of truck deliveries...Although offensive, the statements are clearly statements of opinion and do not rise to the level of 'especially shocking or egregious' conduct *given the context in which they were made."*

As regards the statement that appellant was going to "f____[other drivers}," it was an unverifiable prediction of a future event that communicated an opinion, but not any underlying facts.

In contrast to Bebo, Plaintiff TCA in this case has alleged specific words employed by Defendants on the CHGS website and by Defendant Chaouat, which, in context, impute the fact of scholastic fraud to Plaintiff TCA, which can be proven true or false. Complaint, paragraphs 4, 6, 12, 34-78, 90-92, 104-111.

In sum, Count VII of the Complaint alleges actionable defamation by Defendants in imputing to Plaintiff TCA "scholastic fraud" in presenting evidence on its website to support the contra-genocide viewpoint. Complaint, paragraphs 104-111.   The imputation implies intentional or reckless falsification of evidence by TCA susceptible of being proven true or false. Count VII should not be dismissed as challenging constitutionally protected opinion or an absence of specificity.


## H. STANDING AND QUALIFIED IMMUNITY

Defendants also argue in favor of dismissal for lack of standing and qualified immunity. Memorandum of Law in Support of Defendants' Motion to Dismiss, pages 13-16.   Their arguments have already been answered in this Memorandum in Opposition. As regards standing, the Complaint does allege that Defendants de facto prohibited Plaintiff Cingilli and other students from visiting or using TCA's website because of hostility towards the contra-genocide viewpoint—a clear cognizable constitutional injury. As regards qualified immunity, all of the constitutional rights violated by

Defendants were clearly established and would have been known to a reasonable person, as elaborated previously.

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss should be denied.


Dated:  January $\underline{10^{th}}$, 2011


Respectfully submitted,


BRUCE FEIN
District of Columbia Bar No. 446615
*Pro Hac Vice*
1025 Connecticut Ave., NW, Ste 1000
Washington, D.C. 20036
Telephone:  (703) 963-4968
Facsimile:  (202) 478-1664
Email:  bruce@thelichfieldgroup.com
Attorney for TALDF


       /s/


DAVID SALTZMAN
District of Columbia Bar No. 426201
655 15th Street, NW
Suite 225-F
Washington, DC 2005-5701
Office:  (202) 637-9877
Mobile:  (202) 637-9876
Email:  dsaltzman@turklaw.net
Attorney for TALDF

/s/ Larry Frost

LARRY FROST
District of Minnesota Bar No. 0390227
Paladin Law, PLLC
5113 W 98th St #111
Bloomington, MN 55437
Telephone: (612) 839-5132
Email:  larry.a.frost.atty@comcast.net
Local counsel for TALDF