**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

Turkish Coalition of America, Inc.;             Civil No. 10-4760 (DWF/FLN)
and Sinan Cingilli,

         Plaintiffs,

v.                                                   **MEMORANDUM
OPINION AND ORDER**

Robert Bruininks, in his individual
capacity; Bruno Chaouat, in his
individual capacity; and The University
of Minnesota,

         Defendants.

_____

Bruce Fein, Esq., Bruce Fein & Associates, Inc.; David Saltzman, Esq., Saltzman & Evinch, PC; and Larry A. Frost, Esq., Paladin Law, PLLC, counsel for Plaintiffs.

Brent P. Benrud, Esq., University of Minnesota Office of the General Counsel, counsel for Defendants.

James E. Dorsey, Esq., Fredrikson & Byron, PA, counsel for Amicus Curiae International Association of Genocide Scholars.

_____

**INTRODUCTION**

Plaintiffs Turkish Coalition of America ("TCA") and Sinan Cingilli brought this action against The University of Minnesota and two University officials, Robert Bruininks and Professor Bruno Chaouat, asserting that Defendants violated their constitutional rights to free speech, equal protection, and due process. Plaintiffs also assert state-law claims for defamation. The matter is before the Court on Defendants'

motion to dismiss Plaintiffs' Complaint. For the reasons set forth below, the Court grants Defendants' motion.[1]

## BACKGROUND

TCA is a not-for-profit corporation whose objective is, among other things, to educate the general public about Turkey and Turkish Americans; to foster friendship, understanding and cooperation between the United States and Turkey; to protect the character and ensure a realistic portrayal of Turkey and Turkish Americans in the media and the arts; and to serve as a "think tank of expertise and a clearinghouse of information on Turkey and Americans of Turkish descent." (Compl. ¶ 19.) TCA operates a website through which TCA maintains that the issue of whether the deaths of Ottoman Armenians during World War I constitute a crime of genocide under the Genocide Convention of 1948 and implementing domestic law in the United States is a genuine historical and legal controversy. (Compl. ¶ 3.) TCA's website further "argues that the facts and the law make it unlikely that a genocide charge could be sustained against the Ottoman government or its successor before a neutral arbiter." (*Id.*) This viewpoint is referred to as the "contra-genocide viewpoint." (*Id.*)

The University of Minnesota (the "University") is a public research university founded in 1851. Defendant Robert H. Bruininks is the President of the University. (Compl. ¶ 25.) Defendant Professor Bruno Chaouat is the Director of the Center for

---

[1] The Court considered the briefs filed by the parties, the amicus brief filed by International Association of Genocide Scholars, and Plaintiffs' opposition to the amicus brief.

Holocaust and Genocide Studies ("CHGS") at the University. (*Id*. ¶ 26.) CHGS is a collegiate center in the College of Liberal Arts at the University. Plaintiff Sinan Cingilli is a freshman student at the University. (*Id*. ¶ 24.)

The CHGS considers the killing of Ottoman Armenians during World War I a case of genocide. (Compl. ¶ 91, Ex. 7.) From sometime in 2006 through November 18, 2010, the "Curriculum Models" section of the CHGS website included a statement under the heading "Unreliable Websites":

> We do not recommend these sites. Warnings should be given to students writing papers that they should not use these sites because of denial, support by an unknown organization, or contents that are a strange mix of fact and opinion. We also do not advise using sites with excessive advertising.

(Compl. ¶¶ 8, 34 & Ex. 1 (the "Unreliable Websites Statement").) Stephen Feinstein served as the director of CHGS when the Unreliable Websites Statement was added to CHGS's website. (*Id*. ¶ 34.)

TCA's website was listed as unreliable. Other listed websites included, without limitation, Armenian Issue Blog, Assembly of Turkish American Associations, and Armenian Genocide Debate. (*Id*.) Wikipedia was listed "for anything related to the Holocaust & Genocide, because of the nature of the subject matter & contested history, [sic] can be unreliable." (*Id*.) Some listed websites are noted to be "revisionist" or run by "denier organizations." (*Id*.) Others are noted as being "overly immersed in advertising," believed to "cause[] computer malfunctions," and "interesting but only backed & run by students" with "no indication of academic supervision." (*Id*.)

In late 2008 or early 2009, the Turkish American Legal Defense Fund ("TALDF") protested TCA's inclusion on the list of unreliable websites in a letter to the office of President Bruininks. (Compl. ¶ 79, Ex. 2.) The TALDF's letter read in part:

> It was with both astonishment and chagrin that TALDF discovered that a sister organization, [TCA], is currently de facto censored and stigmatized by the university and [the CHGS] who have placed TCA at the top spot on the CHGS' list of "Unreliable Websites."
>
> . . .
>
> TALDF discerns no bona fide educational purpose for any part of a public university to maintain an official list of "unreliable websites" issued by the decree of one of its institutes.
>
> . . .
>
> Plainly, the list coupled with the warning to students also constitutes viewpoint discrimination that flagrantly violates the First Amendment.

(*Id.*)

The University responded by letter on August 10, 2009, explaining its position that the CHGS had the right to express its opinion regarding the reliability of the information set forth on various websites, that TCA remains free to express its views, and that the CHGS would not remove TCA's website from the list. (Compl. ¶ 81, Ex. 4.) The University's response read in part:

> We find no indication that the list places any restriction on TCA's freedom of speech. TCA remains free to communicate its views. Students and the public at large remain free to access the TCA website. Instead, the list is a statement of the [CHGS's] opinion regarding the reliability of the various websites, and its recommendations regarding the use of the websites by students conducting scholarly research. The Center has the right to formulate and express its opinions on such issues.

(*Id.*)

4

On or about November 5, 2010, Mr. Cingilli met with Professor Chaouat to discuss the use of websites listed as unreliable on the CHGS website for a research paper. (Compl. ¶ 89.)  Plaintiffs allege that Professor Chaouat described the listed websites as "denialist" and discouraged Mr. Cingilli from using the websites.  (*Id*.)  Plaintiff further alleges that when asked, Professor Chaouat did not deny that there would be adverse academic consequences for using the website.  (*Id*.)  Plaintiffs contend that Mr. Cingilli was afraid to use TCA's website after speaking with Professor Chaouat.  (*Id*. ¶ 90.)[2]

On or about November 18, 2010, the CHGS removed the unreliable websites list from its website and replaced it with the following "Warning to Researchers":

> Students and researchers should be aware that there is a proliferation of websites operated by Holocaust and genocide deniers that CHGS and others in the academic community consider unreliable.
>
> CHGS encourages all researchers to exercise caution when they use the Internet and any other media (films, books, journals, etc.).  Our Center, staff, advisory board and experts are here to assist researchers on a case-by-case basis.
>
> We consider it our obligation to orient researchers toward reference materials which, in our opinion, represent the best scholarship in the field of Holocaust and genocide issues.
>
> We recommend that researchers interested in the history, psychology and ideology of Holocaust and genocide denial should begin their investigation with the following resources.
>
> *Remembrance and Denial:  The Case of the Armenian Genocide* by Richard G. Hovannisian.  Detroit:  Wayne State University Press, 1999.

---

[2]   Plaintiffs' Complaint does not allege that Mr. Cingilli was a student of Professor Chaouat's.  Nor does the Complaint indicate for which class he sought to use the TCA website.

> *Denying the Holocaust: The Growing Assault on Truth and Memory* by Deborah Lipstadt. New York: The Free Press, 1993.
>
> *Assassins of Memory: Essays on the Denial of the Holocaust (European Perspectives: A Series in Social Thought and Cultural Criticism)* by Pierre Vidal-Naquet. New York: Columbia University Press, 1993.
>
> This list is NOT exhaustive, and will continue to be updated by the CHGS staff. Please consult with us if you need more information about what we consider to be reliable versus unreliable sources.

(Compl. ¶ 15, Ex. 6.)

On November 19, 2010, the University wrote a letter to TALDF explaining that the CHGS had decided to remove the unreliable websites list from its website. (*Id.* ¶ 16, Ex. 5.) The letter read in part:

> Prof. Chaouat's decision to remove the list from the CHGS website was made well before the University received the draft complaint you prepared on behalf of the Turkish Coalition of America and University student Sinan Cingilli. His decision was based on academic judgment that the list no longer served a significant academic purpose. It does not reflect a determination by the University that the inclusion of the list on the CHGS website violated any legal principle or University policy. For the reasons stated in my prior letter to you, the University believes that the CHGS has the right to express its academic opinions regarding the reliability of websites and any other particular source of information.
>
> During our telephone conference, [counsel for TALDF] also raised concerns on behalf [sic] Mr. Cingilli regarding possible future retaliation in his academic studies. Please be advised that all University students are evaluated based upon the quality of their academic work. The University will not permit any kind of retaliation described by [counsel]. If Mr. Cingilli feels he has been subjected to unlawful retaliation, I encourage him to contact . . . the University's Ombudsman, in the University's Office for Student Resolution.

(*Id.*)

6

On or about November 24, 2010, Professor Chaouat posted a "Response to 'Unreliable Websites'" on the CHGS website:

> This statement is in response to articles published in the *Pioneer Press* on 11-19-2010 and in the *Minnesota Daily* on 11-23-10 regarding the removal of the "unreliable websites" from the website of the Center for Holocaust and Genocide Studies (CHGS) at the University of Minnesota.
>
> I assumed directorship of CHGS in July 2010. Since then, I have focused on promoting the Center's mission of research, education and outreach. I have been speaking with the community and with colleagues on campus to communicate the new initiatives and intellectual orientation of the Center.
>
> My staff and I have invested much effort in trying to update the Center's website. Part of this updating process bears on the educational section, and its listing of websites that CHGS perceives as unreliable sources of information for students and researchers. I decided to remove the section providing links to "unreliable websites." My rationale was quite simple: never promote, even negatively, sources of illegitimate information.
>
> During almost twenty years of working in higher education, I have never put a dubious source on a syllabus for my students, not even for the purpose of delegitimizing the source. The decision to remove the links to "unreliable websites" was made before the Turkish Coalition of America began its efforts to intimidate CHGS into removing the links. The links were replaced with legitimate information devoted to the history, ideology and psychology of Holocaust and genocide denial.
>
> On behalf of the CHGS, I want to reiterate that in accordance with the vast majority of serious and rigorous historians, the CHGS considers the massacre of Armenians during World War I as a case of genocide. To insinuate, as the articles published in the newspapers mentioned above, that the mission of CHGS is somehow influenced and biased by donors' money is incorrect.
>
> Genocide and Holocaust denial is an important issue for CHGS. When I took over the direction of the Center, I put together a lecture series on this very question. This series will begin in 2011 and will continue in the academic year of 2011-12. I invite all persons interested in the issue of genocide and Holocaust denial to attend the lectures and participate in our discussions.

(Compl. ¶¶ 18, 91 & Ex. 7.)

Plaintiffs filed this action on November 30, 2010. In its Complaint, Plaintiffs assert that Defendants violated several of Plaintiffs' clearly established constitutional rights and falsely defamed TCA by branding its website as unreliable.

## DISCUSSION

**I.     Legal Standard**

In deciding a motion to dismiss under Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). In doing so, however, a court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged. *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). A court may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint in deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 579 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. As the United States Supreme Court recently

reiterated, "[t]he threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster under *Twombly*. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 555). In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Twombly*, 550 U.S. at 556.

## II.     Standing

Defendants assert that Plaintiffs lack standing because, on the facts alleged, they cannot establish that they have suffered an injury. Plaintiffs allege that Defendants *de facto* prohibited Mr. Cingilli and other students from visiting or using TCA's website because of Defendants' hostility toward the contra-genocide viewpoint, and that this prohibition constitutes a clear cognizable constitutional injury. For example, Plaintiffs allege that Mr. Cingilli was prohibited from using TCA's website for scholarly research because Defendants discouraged the use of the website and did not deny that there would be adverse academic consequences for using the TCA website. In the same vein, Plaintiffs assert that Defendants' statements had the practical effect of deterring visits to TCA's website and exposure to the contra-genocide viewpoint.

To have standing under Article III of the Constitution, a plaintiff must allege (1) a concrete injury in fact, (2) that is fairly traceable to the challenged action, and (3) that is likely to be redressed by the relief sought. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). In their Complaint, Plaintiffs do not allege that Mr. Cingilli, or any other student, was blocked or banned from accessing the TCA website. Nor do Plaintiffs allege facts showing that Mr. Cingilli, or any other student, was ever prohibited from

9

expressing his own opinion regarding the treatment of Armenians during World War I, or that TCA was ever prevented from making its own views (including its contra-genocide viewpoint) known publicly via its website. Finally, there is no dispute that the Unreliable Websites Statement has been removed from the CHGS website.[3]

Taking all facts in the Complaint as true and construing all reasonable inferences in favor of Plaintiffs, it does not appear that Plaintiffs have adequately alleged a cognizable injury. However, for the purposes of this motion, the Court assumes without deciding that Plaintiffs have standing.

### III.   Defendants' Statements and Academic Freedom

Plaintiffs assert various claims against Defendants. The crux of Plaintiffs' constitutional claims rests on the allegations that Defendants engaged in viewpoint discrimination by "blacklisting" Plaintiffs' website as unreliable, failed to afford TCA notice or the opportunity to be heard prior to deeming TCA's website unreliable, and violated Plaintiffs' right to equal protection by discriminating against their contra-genocide viewpoint. Defendants argue that their contested statements are protected by academic freedom, and for this reason alone, Plaintiffs' claims should be dismissed.

---

[3]   The Court also notes that there is no allegation that Mr. Cingilli was a student of Professor Chaouat's or that Professor Chaouat would have had occasion to review any of Mr. Cingilli's work at the University.

Academic freedom is viewed as a special concern of the First Amendment. The Supreme Court of the United States has recognized the freedom of a university to make its own judgments as to education. *See Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978). This freedom includes the freedom "to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." *Id*. (citing *Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957).) *See also Keyishian v. Bd. of Regents of the Univ. of the State of New York*, 385 U.S. 589, 603 (1967).

Defendants assert that the statements regarding the unreliable websites list constitute expressions of the CHGS's and Professor Chaouat's views regarding the validity of the information set forth on the listed websites, including TCA's, and whether the information should be used in scholarly research. Defendants further assert that they have the right to comment on and critique the views publicly expressed by others, including TCA's contra-genocide viewpoint.

Plaintiffs recognize that bona fide educational judgments should be made by educators and assert that they do not seek to sanction professors for publishing their scholarly opinions of the reliability or value of sources of information. However, Plaintiffs maintain that Defendants made a counter-educational decision by designating TCA's website as unreliable. In doing so, Plaintiffs contend that Defendants delegitimized the contra-genocide viewpoint and engaged in viewpoint discrimination, violated Plaintiffs' free speech rights, violated TCA's right to due process, and discriminated against Plaintiffs' contra-genocide viewpoint. Plaintiffs take particular

issue with the portion of the Unreliable Websites Statement that explains that students writing papers should not use the listed "unreliable websites" "because of denial, support by an unknown organization, or contents that are a strange mix of fact and opinion." Plaintiffs contend that this language is subjective and vague and stigmatizes TCA's website.  In addition, Plaintiffs assert that Defendants failed to give Mr. Cingilli assurances that he would not suffer academically if he used TCA's website.

The Court concludes that this case is properly viewed in the context of academic freedom and that Defendants' statements are protected by that freedom.  The CHGS is free to indicate to students that it thinks certain websites are not proper sources for scholarly research.  The ability of the University and its faculty to determine the reliability of sources available to students to use in their research falls squarely within the University's freedom to determine how particular coursework shall be taught.  The CHGS also acknowledges their viewpoint that the killing of Ottoman Armenians during World War I was genocide.  This viewpoint, as well, is within the purview of the University's academic freedom to comment on and critique academic views held and expressed by others.

Because the Court concludes that Defendants' statements are protected by academic freedom, Plaintiffs cannot maintain their claims against Defendants.  Accordingly, Plaintiffs' claims are properly dismissed with prejudice.[4]

---

[4] Because the Court concludes that Defendants' statements are protected by academic freedom, the Court need not further discuss the merits of Plaintiffs' individual
(Footnote Continued on Next Page)

**IV.    Defamation**

In Counts VI and VII of their Complaint, Plaintiffs assert claims for defamation. Even though these claims are properly dismissed for the reasons stated above, the Court also addresses these claims on their merits. The alleged defamatory statements in this case are the Unreliable Websites Statement and the Chaouat Statement. The Unreliable Websites Statement reads:

> We do not recommend these sites. Warnings should be given to students writing papers that they should not use these sites because of denial, support by an unknown organization, or contents that are a strange mix of fact and opinion. We also do not advise using sites with excessive advertising.

Professor Chaouat's Statement indicated that he decided to remove the section providing links to "unreliable websites" because he did not want to "promote, even negatively, sources of illegitimate information." (Compl. ¶ 18, 91, Ex. 7.) Professor Chaouat further explained that "[t]he links were replaced with legitimate information devoted to the history, ideology and psychology of Holocaust and genocide denial." (*Id*.)

Plaintiffs allege that Defendants "blacklisted" TCA's website and, by doing so,

---

(Footnote Continued From Previous Page)

constitutional claims. Even so, the Court notes briefly that Plaintiffs have failed to state a plausible claim for a constitutional violation. With respect to Plaintiffs' alleged First Amendment violations, Plaintiffs' allegations do not demonstrate that Defendants ever blocked access to TCA's website or prevented students from accessing the contra-genocide viewpoint. Nor do Plaintiffs' allegations demonstrate that Defendants restricted Plaintiffs' ability to publicly express their views or otherwise engage in free speech activities. In addition, Plaintiffs' Complaint fails to identify any constitutionally protected right to which they were deprived to support a due process claim or any basis to support their equal protection claims.

Defendants intended to communicate the false assertion that TCA's contra-genocide viewpoint is tantamount to denying the Holocaust and that no credible scholars support the contra-genocide viewpoint. Plaintiffs contend that by including TCA's website in the list of unreliable websites, some of which are Holocaust denial websites, and by claiming that TCA's website's unreliability was due to TCA's "denial" or "strange mixture of fact and opinion," Defendants implied that Defendants had knowledge of facts that would prove that TCA's website practiced "scholastic fraud" in defending its contra-genocide viewpoint. Plaintiffs further contend that Professor Chaouat's Statement further demonstrates that Defendants meant to stigmatize TCA's website.

Defendants argue that Plaintiffs' Complaint fails to establish a viable cause of action for defamation. Defendants assert that Plaintiffs' allegations lack specificity and particularity. In addition, Defendants assert that the allegedly defamatory statements are actually statements reflecting CHGS's and Professor Chaouat's opinions regarding the reliability of the information on the TCA website and whether the information should be used as the basis for scholarly research. As opinions, Defendants assert that these statements are not actionable. In addition, Defendants assert that while the Armenian Genocide has been the subject of significant scholarly debate, the expression of a view opposing that of TCA is not the same as accusing TCA of scholastic fraud.

Under Minnesota law, a statement is defamatory if it: (1) was communicated to a third party; (2) is false; and (3) tends to harm to the plaintiff's reputation. *See Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 919-20 (Minn. 2009). However, statements that cannot be reasonably interpreted as stating actual facts are protected by the First

Amendment. *See Hunt v. Univ. of Minn.*, 465 N.W. 2d 88, 94 (Minn. Ct. App. 1991) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-21 (1990)). Courts consider four factors when determining whether a statement is fact or opinion: (1) specificity and precision of the statement; (2) verifiability of the statement; (3) the literary and social context in which the statement was made; and (4) public context." *Geraci v. Eckankar*, 526 N.W.2d 391, 397 (Minn. Ct. App. 1995) (citing *McGrath v. TCF Bank Sav.*, 502 N.W.2d 801, 808 (Minn. Ct. App. 1993)). Whether a statement can be proven false is a question of law. *Id.*

After considering these factors, the Court concludes that the alleged statements constitute protected opinions of the CHGS and Professor Chaouat. Defendants have openly acknowledged that the CHGS and Professor Chaouat believe that the killing of Ottoman Armenians during World War I was genocide. Even if the allegedly defamatory statements indicate that the TCA's contra-genocide viewpoint is unreliable, it is clear that this position is one of academic opinion. Accordingly, the Court dismisses Plaintiffs' defamation claims against Defendants.

The Court notes that in order for Plaintiffs' defamation claims to go forward, Plaintiffs would have to be able to establish that the allegedly defamatory statements made on the CHGS website were false. To conclude that Defendants' statements were false, the Court would also have to determine that either the contra-genocide viewpoint is correct or that the issue is a genuine controversy. The problematic nature of such a request highlights why statements of opinion, and particularly academic opinion, are not actionable.

## V.     Qualified Immunity

President Bruininks and Professor Chaouat assert that Plaintiffs' constitutional claims against them in their individual capacities are barred by the doctrine of qualified immunity.  The doctrine of qualified immunity protects state actors from civil liability when "'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Sexton v. Martin*, 210 F.3d 905, 909 (8th Cir. 2000) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Plaintiffs can overcome the defense of qualified immunity by alleging facts that demonstrate the deprivation of a constitutional right and demonstrating that the right was clearly established at the time of the deprivation.  *See Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007).

As discussed above, Plaintiffs' Complaint fails to adequately allege a violation of Plaintiffs' constitutional rights.  Moreover, even if Plaintiffs could state a claim for a constitutional violation, Plaintiffs have not demonstrated that their alleged constitutional rights were clearly established at the time of the alleged violations and that a reasonable person would have known that Plaintiffs' rights were being violated.  Accordingly, Plaintiffs' constitutional claims are properly dismissed as asserted against President Bruininks and Professor Chaouat in their individual capacities.

## CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons set forth above, **IT IS ORDERED** that:

1. Defendants' Motion to Dismiss (Doc. No. [6]) is **GRANTED.**

2. Plaintiffs' Complaint (Doc. No. [1]) is **DISMISSED WITH PREJUDICE**.

3. Motion for Leave to File and Amicus Curiae Memorandum in Support of Motion to Dismiss brought by International Association of Genocide Scholars (Doc. No. [16]) is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.


Dated:  March 30, 2011                    s/Donovan W. Frank
                                          DONOVAN W. FRANK
                                          United States District Judge